# EXHIBIT C

01/26/2007 13:49   4164826788         ROGER S PEACOCK                PAGE 02
-24-2006 TUE 12:48 PM                   FAX NO.                         P. 01

## LICENCE AGREEMENT

THIS AGREEMENT is made as of the 22nd day of April, 2002.

BETWEEN:

> VIRAF S. KAPADIA, an individual resident in the Province of Ontario,
>
> -and-
>
> HILARY VIEIRA, an individual resident in the Province of Ontario,
>
> (the foregoing two parties being hereinafter referred to as the "Licensors")
>
> - and -
>
> STAR NAVIGATION SYSTEMS INC., a corporation incorporated under the laws of the Province of Ontario (the "Licensee")

WHEREAS the Licensors have developed and are the owners of a system and method for transportation vehicle monitoring, feedback and control (the "Licensed Property") described by the Licensors' patent and trademark applications set out in Schedule "A" hereto (the "Patents" and "Trademarks");

AND WHEREAS the Licensors are the owner of certain know-how, technology, confidential information, drawings and specifications and related matters and information which enable the Licensors to manufacture and market the Licensed Property (the "Know-How");

AND WHEREAS the Licensee wishes to have the exclusive right to use, develop, produce, install, implement, market and sell the Licensed Property employing the Know-How in connection with the transportation industry worldwide;

AND WHEREAS the Licensors and the Licensee entered into a licensing agreement dated December 1, 2000 (the "Old Licensing Agreement") in respect of the Licensed Property and Know-How;

AND WHEREAS the Licensors and the Licensee have agreed to enter into a new licence agreement in respect of the Licensed Property and Know-How which would supersede the "Old Licensing Agreement");

NOW THEREFORE, in consideration of the mutual promises and covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which is hereby mutually acknowledged, the parties hereto agree as follows:

1. **DEFINITIONS**

1.1   Definitions. In this Agreement, unless the context otherwise requires, the terms set forth below will have the meanings set forth below:

(a)   "Effective Date" means be the later of the date hereof or such date on which the Licensors will have been paid the Licence Fee in full.

01/26/2007  13:49   4164826788               ROGER S PEACOCK                    PAGE  03
OCT-24-2006 TUE 12:48 PM                    FAX NO.                              P. 02

(b) "Encumbrances" means any mortgage, charge, pledge, hypothecate, lien, encumbrance, restriction, option, right of others or security interest of any kind.

(c) "Know-How" means information, know-how, technology, trade secrets, drawings, plans, specifications, blue prints, material lists, processes and methods, techniques and other confidential information directly or indirectly relating to the Components and the Licensed Property or required for the sourcing, production, manufacture or marketing of the Components and the Licensed Property and all improvements, modifications, extensions or variations of the same if, as and when developed by either the Licensors or the Licensee during the currency of this Agreement and will include any patents or design patents now or hereafter obtained related to the foregoing.

(d) "Patents" means those existing or future patents, industrial design registrations or design patent applications or letters patent which relate to the Licensed Property, the Know-How or the Components, including but not limited the patent applications set out in Schedule "A" hereto and the patents to be granted on the approval of said applications by the relevant authorities.

(e) "Persons" means individuals, partnerships, corporations, associations and all other entities whether incorporated or not incorporated.

(f) "Licence" means the rights over the Licensed Property, Patents, Trademarks and Know-How granted by the Licensors to the Licensee in Section 2 hereof.

(g) "Licence Fee" means the 2,000,000 common shares of the Licensee issued to the Licensors under the Old Licensing Agreement.

(h) "Licensed Property" means the system and method for transportation vehicle monitoring, feedback and control described by the Licensors' patent and trademark applications set out in Schedule "A" hereto;

(i) "Old Licensing Agreement" means the licensing agreement entered into by the Licensors and the Licensee on December 1, 2000, in respect of the Licensed Property and the Know-How.

(j) "Records" means without limiting the generality thereof, all vouchers, purchaser orders, delivery vouchers, bills of lading, bills of sale, statements of account, receipts, ledgers, journals and other books of account and generally all records and data maintained by the Licensee relating to the production, installation, implementation, marketing, promotion and sale of the Licensed Property;

(k) "Term" means the duration of this Agreement as set out in subsection 9.1.

(l) "Trademarks" means those existing or future trademarks, whether or not registered, and trademark applications which relate to the Licensed Property, the Know-How or the Components, including but not limited the trademark applications set out in Schedule "A" hereto and the trademarks to be registered on the approval of said applications by the relevant authorities.

(m) "Transportation Applications" means all applications of the Licensed Property to vehicle monitoring, feedback and control or in connection with the transportation industry, including railroad, automobile, trucking and aviation, whether private, commercial, civil or military. For the purpose of this agreement, "vehicle" will include automobiles, trucks, trains, aircraft and ships of any kind.

2

1.2  **Entire Agreement.** This Agreement together with the agreements and other documents to be delivered pursuant to this Agreement, constitute the entire agreement between the Parties pertaining to the licensing of the Licensed Property and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, and there are no warranties, representations and other agreements between the Parties in connection with the subject matter hereof except as specifically set forth in this Agreement or any other agreement or document to be delivered pursuant to this Agreement.

1.3  **Extended Meanings.** In this Agreement, words importing the singular number include the plural and vice versa; words importing the masculine gender include the feminine and neuter genders.

1.4  **Headings.** The division of this Agreement into articles, sections, subsections and paragraphs and the insertion of headings are for convenience of reference only and will not affect the construction or interpretation of this Agreement.

1.5  **References.** References to an article, section, subsection, paragraph, schedule or exhibit will be construed as references to an article, section, subsection, paragraph, schedule or exhibit to this Agreement, unless the context otherwise requires.

1.6  **Governing Law.** This Agreement will be governed and construed in accordance with the laws of the Province of Ontario and the laws of Canada applicable in that Province.

1.7  **Currency.** Unless otherwise specified, the word "dollar", or the symbol "$" refers to the lawful currency of the United States of America.

1.8  **Schedules.** The following is a list of schedules attached to and incorporated into this Agreement by reference and deemed as part of this Agreement.

   Schedule "A" - Patents and Trademarks

2.  **GRANT OF LICENCE AND EXCLUSIVITY**

2.1  This Agreement supersedes the Old Licensing Agreement as of the Effective Date hereof.

2.2  Subject to the covenants and provisions of this Agreement to be observed and performed by the Licensee, the Licensors hereby grant to the Licensee the exclusive right and license for the Term of this Agreement in respect of the Licensed Property, the Patents, the Trademarks and the Know-How:

   (a)  to use, develop, produce, install, implement, market, promote and sell the Licensed Property worldwide solely for Transportation Applications;

   (b)  to use the Know-How in using, producing, installing, implementing, marketing, promoting and selling the Licensed Property worldwide solely for Transportation Applications; and

   (c)  to use and display the Trademarks in connection with the use, development, production, installation, implementation, marketing, promotion and sale of the Licensed Property worldwide solely for Transportation Applications.

2.3  The Licensors further agree to immediately make available to the Licensee the Know-How relating to the Transportation Applications of the Licensed Property and the Licensee acknowledges that such Know-How will at all times both during and after the term of this Agreement, remain the

3

property of the Licensors which may be used by the Licensee only in accordance with the terms and conditions of this Agreement.

2.4     The Licensors further agree to communicate to the Licensee any new development in the Know-How, Patents, Trademarks or Licensed Property occurring during the currency of this Agreement as they relate to Transportation Applications, for use by the Licensee without additional consideration subject to the terms of this Agreement. The Licensors will communicate every such new development immediately upon its occurrence or upon it becoming known to the Licensors.

2.5     During the Term of this Agreement and provided that the Licensee is not in default in observance of all terms, covenants and provisions required of it herein but subject to Section 10, the Licensors agree that they will not:

(a)     grant to any other Person any right or license to use, develop, produce, install, implement, market, promote and sell the Licensed Property, Patents, Trademarks or Know-How for Transportation Applications anywhere in the world;

(b)     purport to grant to others any rights inconsistent with those granted to the Licensee in this Section 2;

(c)     themselves use, develop, produce, install, implement, market, promote and sell the Licensed Property, Patents, Trademarks or Know-How for Transportation Applications anywhere in the world; and

(d)     communicate the Know-How to any other Person for use in connection with Transportation Applications anywhere in the world.

2.6     The Licensee undertakes not to employ, without the written consent of the Licensors, the Know-How, Patents, Trademarks or Licensed Property for any purpose other than for Transportation Applications, and further undertakes not to knowingly divulge the Know-How to any other Person except as authorized by the terms of this Agreement. The Licensors and Licensee both undertake to use their best efforts to prevent any unauthorized disclosure or use of the Know-How.

2.7     The Licensee will be permitted to grant to others the Licence granted to it in this Section 2, provided that each sub-licensee assumes in writing the obligations of the Licensee contained herein in form acceptable to the Licensors. The Licensee will forward to the Licensors a certified copy of each sub-licensing agreement. It is understood and agreed that should any sub-licensee breach its sub-licensing agreement with the Licensee, the Licensee covenants and agrees to forthwith terminate such sub-licensing agreement.

3.      **COMMUNICATION OF KNOW-HOW**

3.1     On the Effective Date of this Agreement and within a reasonable time after receipt of a request therefor made by the Licensee from time to time during the Term of this Agreement, the Licensors will deliver the Know-How to Licensee as recorded in writing or in other tangible form. Such delivery will be effected at such locations as the parties agree upon either by physical delivery or by other convenient means provided always that title and risk of loss to the Know-How will remain with the Licensors until delivery and then will pass to the Licensee.

4

3.2  For the purpose of acquiring such Know-How as may not be subject to physical delivery, the Licensors may send an authorized officer or a technically qualified employee to the Licensee's or any sub-licensee's plant in the Territory to communicate such Know-How at the expense of the Licensee.

4.3  For a period of up to six weeks from the Effective Date or request for supplementary Know-How, the Licensors will make available to the Licensee one of its representatives to supervise the implementation of the Know-How provided that the Licensee will pay for all economy travel and reasonable living expenses and the reasonable wages of such representative.

4. **KNOW-HOW CONFIDENTIAL**

5.1  The Licensee hereby acknowledge that the Know-How is secret and confidential to the Licensors, that its disclosure to Licensee is for the sole purpose of enabling the Licensee to use, produce, install, implement, market, promote and sell the Licensed Property for Transportation Applications using the Know-How, and that the Licensee has no right to resell or transfer such Know-How but only to use the same as set out in Section 2 above.

4.2  The Licensee will ensure that all Know-How is recorded in tangible form and all copies marked as being confidential and the property of the Licensors.

5.3  The Licensee will use all reasonable efforts to maintain the secrecy of the Know-How, and will disclose the Know-How only to those of its officers or employees whose duties require them to know the same and only if such persons have given to the Licensee an enforceable undertaking not to disclose any part of the Know-How to any unauthorized Persons. Further, the Licensee covenants and agrees that it will not, and covenants to use its best efforts to ensure that its employees and sub-licensees will not disclose, distribute, sell, use or otherwise make available to any other Persons, including any proposed sub-licensees of the Licensee, any of the Know-How without the Licensors' prior written consent. The Licensee will require its employees and sub-licensees to execute a non-disclosure covenant in a form approved by the Licensors. The provisions of this section will remain binding upon the parties hereto notwithstanding any assignment of this Agreement whether or not consented to by the Licensors. The Licensee and its employees and sub-licensees, as the case may be, will be released from the obligations of this clause only with respect to such portion of the Know-How which:

(a)  is available to the public in publication or tangible form as of the date it is disclosed to the Licensee;

(b)  becomes available to the public in tangible form anywhere in the world through no cause due to the Licensee, its employees, agents or those whom they have a right to control or to whom they have disclosed information;

(c)  is already in the possession of the Licensee from sources other than the Licensors and there is documentary evidence to that effect; or

(d)  has been received from a Person who is not under an obligation of confidence to the Licensors.

5. **QUALITY CONTROL, IDENTIFICATION AND OWNERSHIP**

5.1  The Licensee will:

(a) use its best efforts to use, produce, install and implement the Licensed Property for Transportation Applications strictly in accordance with the Know-How and to the standards of quality normally required by the Licensors;

(b) permit the duly authorized representatives of Licensors to inspect the facilities and operations of the Licensee or any of its sub-licensees, agents or sub-contractors at the Licensors' expense during normal working hours;

(c) give warranties to its customers as to the quality and fitness of the Licensed Property, used, produced, installed or implemented by the Licensee; and

(d) adhere at all times to the quality control standards and specifications communicated in writing by the Licensors to the Licensee.

6.2 If the Licensee believes it can improve the quality of its use, production, installation or implementation of the Licensed Property by altering in a certain respect or in certain respects the Know-How, it will advise the Licensors of the alterations it proposes and will be permitted to make such alterations only upon receiving the written consent of the Licensors. The Licensors will not unreasonably withhold such consent. For greater certainty, if after having receive the Licensee's written request for any such consent, the Licensors will fail to provide its consent in writing within fifteen (15) days of the date of such request, the Licensors will be deemed to have consented to the proposed alterations.

5.3 The Licensee further covenants and agrees that it will use its best efforts to market and promote the Licensed Property and will set its prices and its terms of credit at levels which are commercially reasonable and competitive in order to hold and expand its share of the market for the Licensed Property. The Licensee further covenants and agrees to use its best efforts to create, extend and develop a market for the Licensed Property by intensive, consistent and continuous promotion and advertisement so as to create a public interest in the Licensed Property.

5.4 The Licensee covenants and agrees that it will mark the Licensed Property with all applicable Trademarks in a manner and in a form agreed to by the Licensors and will also imprint thereon the markings required to identify all applicable Patents. The size and style of the markings will be such that they are readily identifiable and readable.

5.5 The Licensee covenants and agrees that all cartons, tags, labels and other printed literature, including advertising or price lists utilized by the Licensee in the use, production, installation, implementation, marketing, promotion and sale of the Licensed Property, will bear the Trademarks and the aforesaid certification and listing in a manner and in a form to be approved by the Licensors before printing and distribution and will include all such changes or amendments as the Licensors will reasonably deem necessary to protects its property rights.

5.6 The Licensee covenants and agrees that it will not contest, directly or indirectly, the validity of the Licensors' ownership of the Licensed Property, Patents, Trademarks and Know-How.

5.7 Subject to the provisions of Section 7 below, all applications the registration of Patents and Trademarks will be made and pursued by the Licensees in the name of the Licensors and at the sole expense of the Licensees. The Licensees agree to diligently pursue the registration of all outstanding applications for Patents, Trademarks and other intellectual property rights. The Licensors and Licensee agree to each other such reasonable assistance as the other may require in connection h... .h.

6

5.8    It is agreed and understood by the parties hereto that nothing in this Agreement will confer on the Licensee a proprietary interest in the Licensed Property, Patents, Trademarks or Know-How, the Licensee hereby specifically acknowledging the Licensors' superior rights thereto.

5.9    The Licensee agrees to be a permitted user of the Trademarks and agrees to execute such permitted user agreements as may be required. All such permitted user agreements shall be prepared at the sole expense of the Licensors.

## 6. IMPROVEMENTS

6.1    If during the Term of this Agreement the Licensee develops any improvements in or inventions relating to the Licensed Property, the Patents, the Trademarks or the Know-How, it will disclose and make such improvements or inventions available to the Licensors who will have the right to use the same to the extent permitted under Section 2 above. If any such improvement developed by the Licensee is eligible for protection under the patent, trademark or industrial design laws of any jurisdiction in which the Licensee is carrying on business under the Licence, the Licensee will at the Licensors' request make or cause the inventor to make the necessary application for patent, trademark or other intellectual property rights for the same and will pursue each application to until letters patent or other relevant registrations have been issued or conclusively denied. At the request of the Licensors, the Licensee will assign or procure the assignment of any such registration or letters patent to the Licensors in which event the Licensors will reimburse the Licensee for all legal fees, court costs, and filing fees incurred by Licensee in procurement of such registration or letters patent.

## 7. INDEMNITIES AND WARRANTIES

7.1    The Licensors hereby covenant and agree to indemnify and hold harmless the Licensee, its servants, agents or employees from any losses or damages, consequent upon any failure or defect in the design or construction of any part of the Licensed Property or the Know-How or from any breaches of the Licensors' warranties and representations made herein or from any damages resulting from any negligent acts or omissions of the Licensors, their servants, agents or employees or from any misuse of the Licensed Property, Patents, Trademarks or Know-How by the Licensors, their servants, agents or employees.

7.2    Subject to the indemnity provided by the Licensors to the Licensee in subsection 7.1 above, the Licensee hereby covenants and agrees to indemnify and hold harmless the Licensors, their servants, agents or employees from any and all claims which may be made against the Licensors, their servants, agents or employees arising out of any breaches of the Licensees warranties and representations made herein or out of the use, failure, or misuse of the Licensed Property, Patents, Trademarks or Know-How by the Licensee, its servants, agents or employees, whether or not the same results from any wrongful or negligent act of the Licensee and its servants, agents or employees.

7.3    The Licensors hereby represent and warrant to the Licensee as follows and acknowledge that the Licensee is relying on these representations and warranties in entering into this Agreement and performing its obligations hereunder:

(a)    **Capacity and Authorization** - The Licensors have full capacity, power, right and authority to enter into this Agreement and to perform their obligations under it.

(b)    **Binding Obligation** – This Agreement has been duly executed and delivered by the Licensors and constitutes a valid and binding obligation enforceable against them in accordance with its terms subject to the rights of creditors and applicable laws.

(c) **Title** – The Licensors are the sole legal and beneficial owners of all rights in and to the Licensed Property, Patents, Trademarks and Know-How free and clear of all Encumbrances.

(d) **Applications** – The applications for the Patents and Trademarks identified in Schedule "A" hereto have been validly made and pursued under the relevant laws and are currently in good standing. The Licensors are not aware of any objection to said applications made by any relevant authority, and are not aware of any reason why letters patent or registrations (as the case may be) would not be granted in respect of such applications.

(e) **No Infringement** – The Licensed Property, Patents, Trademarks and Know-How do not infringe on any patent, copyright, trademark, or other intellectual property right owned by any other Person.

(f) **No Conflicting Grants** – The Licensor has not granted to any Person other than the Licensee any rights or licences over the Licensed Property, Patents, Trademarks and Know-How.

(g) **No Claims** – The Licensors are not aware of any claim made by any Person disputing the Licensor's right, title and interest in and to the Licensed Property, Patents, Trademarks and Know-How and the validity or enforceability of the same, or asserting that Licensed Property, Patents, Trademarks and Know-How infringe on a patent, copyright, trademark or other intellectual property right owned by such Person.

(h) **Absence of Conflict** – The Licensors are not a party to, bound or affected by any agreement which would be violated, breached or terminated by, or which would constitute a bar or other hindrance to the transactions contemplated herein, as a consequence of the execution and delivery of this Agreement or the consummation of the transactions contemplated in this Agreement. The consummation of transactions contemplated herein do not and will not conflict with, or result in a breach of, or constitute a default under the terms or conditions of any court or administrative order or process, any agreement or instrument to which the Licensors are party or by which they are bound.

(i) **No Bankruptcy** - No proceedings have been taken, are pending or authorized by the Licensor or by any other person in respect to the bankruptcy, insolvency, liquidation, dissolution or winding up of either of the Licensors.

(j) **Litigation** – There are no judgements, decrees, injunctions, ruling or orders of any court, governmental authority or arbitration, or any actions, suits, grievances or proceedings (whether or not on behalf of Licensor) pending or threatened against either of the Licensors which may result in the imposition of any Encumbrances on the Licensed Property, Patents, Trademarks or Know-How.

(k) **Regulatory Approvals** – No governmental or regulatory authorization, approval, order, consent or filing is required on the part of the Licensors, in connection with the execution, delivery and performance of this Agreement and the performance of the Licensors' obligations under this Agreement.

8. **LICENCE FEE AND OTHER ARRANGEMENTS**

8.1   The consideration for the grant of the Licence shall consist of 2,000,000 common shares of the Licensee. The Licensors hereby acknowledge having received 2,000,000 common shares of the Licensee, which were issued by the Licensee pursuant to the Old Licensing Agreement, and accept said shares as full consideration for their grant of the Licence to the Licensee under this Agreement.

8

9. **TERM AND TERMINATION**

9.1  The right and licence hereby granted to the Licensee hereunder will commence on the Effective Date and will continue in effect until the earlier of:

(a)  the expiry of the last of the Patents; or

(b)  the termination of this Agreement in accordance with the provisions of this Section 9.

9.2  The Licensors will have the right to terminate this Agreement upon the happening of any one or more of the following events:

(a)  the Licensee's failure to comply with any of the other terms and conditions contained herein by the 30th day next following the date of its receipt of notice from the Licensors of its failure to comply;

(b)  the bankruptcy or insolvency of the Licensee or the appointment of a receiver of liquidator to take charge of the affairs of the Licensee or the making of an assignment for the benefit of the Licensee's creditors;

(c)  the Licensee ceasing or threatening to cease to carry on business, unless such business will be continued by a subsidiary of the Licensee or a Person which has acquired all of the issued and outstanding shares of the Licensee, including the shares issued to the Licensors pursuant to Section 8 above, or a Person with which the Licensee has amalgamated; or

(d)  the Licensee changing its main business from the use, production, installation, implementation, marketing, promotion and sale of the Licensed Property for Transportation Applications, unless such business will be continued by a subsidiary of the Licensee or a Person which has acquired all of the issued and outstanding shares of the Licensee, including the shares issued to the Licensors pursuant to Section 9 above, or a Person with which the Licensee has amalgamated.

9.3  Upon termination of this Agreement for any reason or cause other than the expiry of the last of the Patents:

(a)  the Licence granted herein will immediately cease;

(b)  the Licensee will immediately discontinue using, producing, installing, implementing, marketing, promoting or selling the Licensed Property; and

(c)  the Licensee will immediately discontinue and undertake not to use the Trademarks and Know-How or any other similar or related trademarks or trade names which may be confused with the Trademarks in association with its;

provided, however, that the Licensee will have an additional sixty (60) days (hereinafter referred to as the "Holdover Period") beyond the termination date to complete any work in progress as at the date of termination.

9.4  Upon termination of this Agreement for any reason or cause whatsoever, the obligations of the Licensors hereunder to communicate any further Know-How will forthwith terminate. The Licensee will continue to be bound by the provisions of Section [?] hereof.

9

9.5   No failure on the part of the Licensors to exercise any right of termination hereunder will be construed to prejudice to eliminate such right or any subsequent right of termination for the same or any other cause provided for herein.

10.  **INFRINGEMENT**

10.1  The Licensors and the Licensee will promptly notify each other in writing of any infringement or perceived infringement of any proprietary interest either may have arising from or with respect to the subject matter of this Agreement and which comes to the attention of either of them. If any party (hereinafter referred to as the "Infringer") other than the Licensors, the Licensee or any one else licensed by the Licensors, uses, produces, installs, implements, markets, promotes or sells any product or service that is the same as or similar to the Licensed Property, which infringes upon the Patents, or identifies same with the Trademarks or any similar or related trademark or trade name with infringes upon the Licensors' proprietary interest in the Trademarks, the Licensors will have the first right to institute proceedings against the Infringer and may add the Licensee as a party thereto whereupon the cost of the proceedings will be shared equally; provided, however, that if the Licensee wishes to withdraw from the proceedings it may do so on thirty (30) days notice to the Licensors and in such event, the Licensee will incur no further costs related to the proceedings and will relinquish all claims for damages recovered by the Licensors and will have no right to make any claims against the Licensors therefor. If the Licensee does not withdraw from the proceedings, any damages recovered will be shared by the Licensee and Licensor in such manner as the trier of the proceedings will determine, or in the absence of any such award in such manner as the Licensor and Licensee may agree in writing and failing their agreement in writing in such manner as may be determined by arbitration.

10.2  In the event that the Licensors will choose not to commence proceedings against the Infringer, the Licensee may do so on its own behalf in which event all costs incurred will be borne entirely by the Licensee and all damages recovered by the Licensee will accrue solely for the benefit of the Licensee.

11.  **GENERAL**

11.1  This Agreement and all rights or obligations arising hereunder may not be assigned or otherwise transferred by either party hereto, and will not enure to the benefit of any liquidator, trustee in bankruptcy, receiver or other successor in title of the assigning party whether by operation of law or otherwise, without the prior written consent of the other party or parties hereto. Any such purported assignment or transfer without the other party's or parties' prior written consent will be null and void. For the purpose of this subsection, the sub-licensing of the Licence by the Licensee pursuant to the provisions of subsection 2.6 above shall not be deemed an assignment of this Agreement or any rights or obligations thereunder.

11.2  The Licensors and the Licensee are not and will not be considered to be joint venturers, partners or agents of each other and neither of them will have the power to bind or obligate the other except as set forth in this Agreement. The Licensee specifically covenants and agrees that it will in no way incur any contractual or other obligation in the name of the Licensors and the Licensors will have no liability for any debts incurred by or on behalf of the Licensee.

11.3  Should any provision or provisions of this Agreement be illegal or unenforceable, it or they will be considered separate and severable from the Agreement and its remaining provisions will remain in force and be binding upon the parties hereto as though the said illegal or unenforceable provision or provisions had never been included.

11.4  This Agreement will enure to the benefit of and be binding upon each of the parties hereto and upon their respective successors and permitted assigns.

11.5  The parties agree that they and their successors and permitted assigns will be bound to execute such further agreements, assurances, papers and documents, and to cause such by-law and resolutions to be enacted and to exercise such votes and influence and do and perform or cause to be done and performed such further and other acts or things as may be necessary or desirable from time to time in order to act in good faith and to give full effect to this Agreement and every part thereof.

11.6  This Agreement constitutes the entire agreement between the parties hereto and supersedes all prior negotiations, understandings and agreements of any nature or kind whatsoever with respect to the subject matter hereof. Any amendment or amendments to this Agreement to which the parties may agree from time to time will, in order to be binding, be made in writing.

11.7  All notices, demand or other communications required to be made or given pursuant to the terms of this Agreement will be in writing and will be delivered personally, by facsimile transmission, or by courier, to the parties at their respective addresses has hereinafter set out, or such other addresses as the parties may subsequently advised in writing. Any notice, demand or other communication delivered personally will be deemed to have been received on the actual day of delivery, if transmitted by facsimile on the day of transmission and if delivered by courier will be deemed to have been received on the first day of business next following the date the same as delivered by the sender to the courier. The following will be the addresses for the deliver of notices of each of the parties:

(a)  For the Licensors:

Viraf S. Kapadia
4117 Mississauga Road
Mississauga, Ontario, L5L 2S5
Fax: (905) 602-5000

Hilary Vieira
3846 Trelawney Circle
Mississauga, Ontario, L5N 5J5
Fax: (905) 824-5312

(b)  For the Licensee:

Star Navigation Systems Inc.
2970 Lakeshore Boulevard West, Unit 300
Toronto, Ontario, M8V 1J7
Fax: (416) 252-3963

11.8  Time will in all respects be the essence of this Agreement.

11.9  This Agreement will be governed by and construed in accordance with the laws of the Province of Ontario, and the federal laws of Canada applicable therein.

11.10  The Licensors acknowledge having been advised to seek independent legal counsel in respect of this Agreement and the matters contemplated herein. To the extent that a Licensor declines to receive independent legal counsel in respect of the Agreement, that Licensor hereby waives the right, should a dispute later develop, to rely on its lack of independent legal counsel to avoid its obligations, to seek

inferences from the foregoing, or to otherwise attack the integrity of the Agreement and the provisions thereof, in whole or in part.

11.11  This Agreement may be executed by the parties in one or more counterparts by facsimile, each of which when so executed and delivered shall be an original and such counterparts shall together constitute one and the same instrument.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

LICENSORS:

_____           _____
Witness   Jas Gill                Vijay S. Kapadia

_____           _____
Witness   Robin Baker             Bobby Vichra

STAR NAVIGATION SYSTEMS INC.

Per: _____
     Authorized Signing Officer
     I have authority to bind the corporation.

12

## SCHEDULE "A"

### THE PATENTS

1. U.S. Patent Application

   Serial No.: 60/219736
   Date Filed: July 20, 2000
   Title: "SYSTEM AND METHOD FOR TRANSPORTATION VEHICLE MONITORING AND FEEDBACK"
   Inventor: Viraf S. Kapadia

2. U.S. Patent Application

   Serial No.: 60/275520
   Date Filed: March 14, 2001
   Title: "SYSTEM AND METHOD FOR TRANSPORTATION VEHICLE MONITORING, FEEDBACK AND CONTROL"
   Inventor: Viraf S. Kapadia and Hilary Vieira

3. Patent Cooperation Treaty Patent Application

   Serial No.: PCT/IB01/01576
   Filed: July 20, 2001
   Title: "SYSTEM AND METHOD FOR TRANSPORTATION VEHICLE MONITORING, FEEDBACK AND CONTROL"
   Inventor: Viraf S. Kapadia and Hilary Vieira

### THE TRADEMARKS

1. U.S. Trademark Registration Application

   Serial No.: 76/224636
   Filed: March 15, 2001
   Mark: "ISMS"

2. U.S. Trademark Registration Application

   Serial No.: 76/224635
   Filed: March 15, 2001
   Mark: "Star Navigation Systems"

indulgences from the Licensee, or to otherwise attack the integrity of the Agreement and the provisions thereof, in whole or in part.

11.11  This Agreement may be executed by the parties in one or more counterparts by facsimile, each of which when so executed and delivered shall be an original and such counterparts shall together constitute one and the same instrument.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first above written.

                                                            LICENSORS:

_____        _____
Witness                               Viraf S. Kapadia

_____        _____
Witness                               Hilary Vieira

                                                            STAR NAVIGATION SYSTEMS INC.

                                                            Per. _____
                                                                     Authorized Signing Officer
                                                          I have authority to bind the corporation.

H:\Corporate Securities\Companies\S\Star Navigation Systems Inc\Licence agt re option apr 22-02.doc

# LICENSING AGEEMENT

This LICENSING AGREEMENT MADE THIS 1ST DAY OF December 2000 by Viraf S Kapadia & Hilary Vieira (Inventors and Licensors) whose address is on addendum 1 and Star Navigation Systems Inc., an Ontario (Canada) Corporation, with offices at 2970 Lakeshore Blvd West, Toronto, Ontario, M8V 1J7 Ontario, Canada (Licensee)

WITHNESSETH:

Whereas, The Licensor possesses certain technology to provide and supply only the Aviation rights to a System design under patent applied for, application number:Atty.Dkt.No. P271732 see PW form attached, together with a trademark for the ISMS (Inflight Safety Monitoring System).
Whereas, Licensee wished to have the exclusive rights to promote, use, market, sell and distribute the technology in connection with the Licensee's services and the promotion, use, marketing, selling and distributing thereof in the territory and licensor is willing to grant such exclusive rights to licensee on the terms and conditions hereinafter set forth.

NOW THEREFORE IN CONSIDERATION of the mutual covenants and promises contained herein, the parties hereby agree as follows:

1. **Definitions:**

   "Licensed property", means all names, logos, symbols, emblems, designs, likeness and visual representations ad any product used in conjunction.

   "Advisory board" means the party is not on the advisory board or on the board of directors of the company.

2. **License**

   The Licensors/inventors hereby grant to Licensee, and Licensee hereby accepts from the Licensor, the exclusive, ~~non-transferable~~ right and license to use, sell, market, develop and otherwise distribute the licensed property in connection with and only with the Aviation rights be its Private, Commercial, Civil and Military use worldwide.

3. **License fee & Royalties:**

   The fee for the license is 2 million common shares of Star Navigation Systems Inc and subsequently, in proportion by any other company the technology may be transferred to with the licensors permission. The Licensor has received these shares of common stock of the Licensee as payment in full for the Licensing fee, and in addition the licensee will bear total cost of the patents.

4. **Term**

    Subject to the further provisions hereof regarding early termination, the term of this agreement shall be for the life time of Star Navigation Systems Inc., or its new name if acquired by another company or strategic partners name or the life of the patent any new innovations, patent filed by the inventors all aviation rights will be conferred or passed on to the Licensee, and all costs for such new patents will be borne by the Licensee in addition to a share package to be negotiated with the Licensee, based on a technological valuation acceptable to both parties.

5. **Additional Termination Rights of Licensor**

    The Licensor agrees to have the two inventors at all times on its advisory board, failing which section 7 applies.

    The bankruptcy of the company

    The amalgamation and or the sale of the company

    The Licensor fails to make any payment to the Licensees

    The Licensee ceases or threatens to cease to carry on its business

    The Licensee changes its main business operations

6. **Effect of Termination**

    Upon termination of this agreement as herein provided

    All rights of the License hereunder shall immediately terminate and revert to the Licensor except wherein explicitly negotiated and the Licensee shall forthwith discontinue all use of the "Licensed Property"

    The Licensee however may retain all maintenance liabilities and or maintenance contracts it may have drawn up with customers.

7. **Removal from Advisory Board**

    Removal from the advisory board will result in the payment of 5 million shares to each of the inventors as a one time final non-refundable settlement.

8. **Governing Law**

    This Agreement shall be governed by and construed in according with the Laws of Ontario Canada without regard to its conflict of law doctrine of the Provincial and Federal courts located in the City of Toronto.

IN WITNESS WHEREOF, Licensor and Licensee has caused this agreement to be executed by its duly authorized officer, all as of the date first here fore written.

The Licensors (Inventors)
Viraf S Kapadia

Hilary Vieira

Licensee
Star Navigation Systems Inc.,

Viraf S Kapadia
Title: CEO

Hilary Vieira
President

Dale Sparks
Director & CIO.