DANIEL P. ALBERS (admitted *pro hac vice*)
JEFFREY A. RUPPEL (admitted *pro hac vice*)
BARNES & THORNBURG LLP
One N. Wacker Drive, Suite 4400
Chicago, IL 60606
Phone No.: (312) 357-1313
Fax No.: (312) 759-5646
Email: dalbers@btlaw.com
Email: jruppel@btlaw.com

CHRISTINE H. MCCARTHY (admitted *pro hac vice*)
BARNES & THORNBURG LLP
750 17th Street N.W., Suite 900
Washington, D.C. 20006-4675
Phone No.: (202) 289-1313
Fax No.: (202) 289-1330
Email: cmccarthy@btlaw.com

JEFFREY K. LEE, CA Bar No. 212465
KIMBERLY A. DONOVAN, CA Bar No. 160729
GCA LAW PARTNERS LLP
1891 Landings Drive
Mountain View, CA 94043
Phone No.: (650) 428-3900
Fax No.: (650) 428-3901
Email: jlee@gcalaw.com
Email: kdonovan@gcalaw.com

Attorneys for Plaintiff STAR NAVIGATION SYSTEMS GROUP LTD.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| STAR NAVIGATION SYSTEMS GROUP LTD., | Case No. C 07-4820 MMC |
| Plaintiff, | **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S SECOND MOTION TO DISMISS; AND REQUEST FOR LEAVE TO CONDUCT JURISDICTIONAL DISCOVERY** |
| v. | |
| AEROMECHANICAL SERVICES LTD., | |
| Defendant. | Honorable Maxine M. Chesney |
| | Date: January 25, 2008 |
| | Time: 9:00 a.m. |
| | Place: Courtroom No. 7, 19th Floor |

Case No. C 07-4820 (MMC)
Plaintiff's Mem. P's and A's in
Opp'n to Second Motion to Dismiss

**TABLE OF CONTENTS**

Page No.

INTRODUCTION ................................................................................................... 1

ISSUES TO BE DECIDED ....................................................................................... 2

STATEMENT OF RELEVANT FACTS.................................................................... 2

A.    Plaintiff Star and its Patented Technology ............................................ 2

     1.    Star's Full and Exclusive Rights to The '852 Patent ................. 3

     2.    Star's Right to Sue In Its Own Name and the Instant Action......... 3

B.    Defendant AMS and its Contacts to California ...................................... 4

     1.    AMS' Publicly-Known Products and Support Services ......... 4

     2.    AMS' Publicly-Known Customers ............................................ 6

     3.    AMS' Potential California Customers ....................................... 8

C.    The Parties' Negotiations Regarding Jurisdictional Discovery
     And Scheduling .................................................................................... 10

ARGUMENT ........................................................................................................ 11

I.    STAR HAS STANDING TO SUE ON ITS OWN BECAUSE THE
     INVENTORS GRANTED ALL SUBSTANTIAL PATENT RIGHTS
     AND AMS' SO CALLED "FIELD OF USE" ENCOMPASSES
     THE FULL SCOPE OF THE PATENT ............................................... 11

A.    The Patent Owner Must Be Joined Only if the Exclusive
     License Receives Fewer Than All Substantial Patent Rights .... 11

B.    Star Is The Exclusive Licensee Holding All Substantial Rights
     in the '852 Patent ................................................................................ 11

     1.    No Field of Use Limits Star's Right to Practice the
         '852 Patent.................................................................................. 11

     2.    Security and Commercial Provisions Do Not Limit
         Star's Patent Rights .................................................................. 13

     3.    Mere Allegations in the Canadian Litigation Cannot
         Terminate the License .............................................................. 15

C.    Neither Inventor is Indispensable Because Both Authorized Star to File This Suit Pursuant to the Terms of the License and Declined to Participate as Individual Party-Plaintiffs ........................................................................ 16

II.    PERSONAL JURISDICTION EXISTS DUE TO AMS' ACTIVE PRODUCT DISTRIBUTION TO REGISTERED CALIFORNIA BUSINESSES OPERATING AT NUMEROUS STATE AIRPORTS AND REGULAR, ONGOING COMMUNICATIONS NECESSARY FOR USE OF ITS ACCUSED SYSTEM WITHIN THE STATE ........................................................................................ 17

III.    PLAINTIFF SHOULD BE GRANTED EXPEDITED JURISDICTIONAL DISCOVERY TO SUPPLEMENT THE RECORD ...................................................................................... 19

A.    Jurisdictional Discovery Will Allow Star to Address Specific Factual Claims and Evidence at Issue Here ................ 19

B.    Star is Likely to Discover Additional Evidence Supporting Personal Jurisdiction .................................................. 22

IV.    PENDING DEADLINES SHOULD BE ENLARGED AND CONTINUED TO ALLOW COMPLETION OF JURISDICTIONAL DISCOVERY AND SUBSEQUENT SUBMISSION OF BRIEFS ........................................................................ 23

V.    AMS IS NOT ENTITLED TO ATTORNEYS' FEES FOR REVIEWING AND RESPONDING TO THE FIRST AMENDED COMPLAINT .................................................. 24

CONCLUSION ........................................................................................ 25

1

## **TABLE OF AUTHORITIES**

2

3    <u>Cases</u>                                                    <u>Page No.</u>

4    *Abbott Labs. v. Diamedix Corp.,*
5        47 F.3d 1128 (Fed. Cir. 1995) ............................... 17

6    *Akro Corp. v. Luker,*
7        45 F.3d 1541 (Fed. Cir. 1995) ............................... 17

8    *Applied Interact, LLC. v. Vt. Teddy Bear Co.,*
     2005 U.S. Dist. LEXIS 15016
9        (S.D.N.Y.  Sept. 6, 2005) ..................................... 11

10   *Asahi Metals Indus. Co. v. Superior Court,*
11       480 U.S. 102 (1987) ............................................. 19

12   *Aspex Eyewear, Inc. v. Miracle Optics, Inc.,*
13       434 F.3d 1336 (Fed. Cir. 2006) ............................ 15

14   *Beverly Hills Fan co. v. Royal Sovereign Corp.,*
15       21 F.3d 1558 (Fed. Cir. 1994) ............................... 17

16   *Breckenridge Pharm., Inc. v. Metabolite Labs, Inc.,*
         444 F.3d 1356 (Fed. Cir. 2006) ............................ 17
17
     *Commissariat a l'Energie Atomique, v. Chi Mei Optoelectronics Corp.,*
18       395 F.3d 1315 (Fed. Cir. 2005) ............................ 19

19   *Doe v. Unocal Corp.,*
20       248 F.3d 915 (9th Cir. 2001) ............................... 22

21   *Elec. For Imaging, Inc. v. Coyle,*
22       340 F.3d 1344 (Fed. Cir. 2003) ............................ 17

23   *Ethicon, Inc. v. United States Surgical Corp.,*
24       135 F. 3d 1456 (Fed. Cir. 1998) ............................ 15

25   *Helicopteros Nacionales de Colombia v. Hall,*
26       466 U.S. 408 (1984) ............................................. 18

27   *Independent Wireless Telegraph Co. v. Radio Corp. of Am.,*
         269 U.S. 459 (1926) ......................................... 16, 17
28

OCA Law Partners LLP
1891 Landings Drive
Mountain View, CA  94043
(650)428-3900

Case No.: C07-4820 (MMC)

*In re Keegan Management Co. Securities Litigation,*
   78 F.3d 431 ( 9th Cir. 1996) ................................................................. 25

*Intellectual Prop. Dev. Inc. v. TCI Cablevision of Cal., Inc.,*
   248 F. 3d 1333 (Fed. Cir. 2001) ............................................... 11, 14, 15

*Int'l Gamco, Inc.v. Multimedia Games, Inc.*
   504 F.3d 1273 (Fed. Cir. 2007) ..................................................... 11, 15

*Int'l Nutrition Co. v. Horphag Research Ltd.,*
   257 F.3d 1324 (Fed. Cir. 2001) ........................................................... 15

*International Shoe Co. v. Washington,*
   326 U.S. 310 (1945) ............................................................................. 17

*InternetAd Sys., LLC v. Opodo Ltd.,*
   481 F. Supp. 2d 596 (N.D. Tex. 2007) ............................................... 13

*McNeilab, Inc. v. Scandipharm, Inc.,*
   1996 U.S. App. LEXIS 19073 ( Fed. Cir. 1996) ................................ 13

*Mentor H/S, Inc. v. Med Device Alliance,*
   240 F.3d 1016 (Fed. Cir. 2001) ........................................................... 15

*Morrow v. Microsoft Corp.,*
   499 F.3d 1332 (Fed. Cir. 2007) ........................................................... 14

*Pebble Beach v. Caddy,*
   453 F.3d 1151 (9th Cir. 2006) ............................................................. 20

*Propat Int'l Corp. v. RPOst US, Inc.,*
   473 F.3d 1187 (Fed. Cir. 2007) ........................................................... 14

*Red Wing Shoe Co. v. Hockerson-Halberstadt, Inc.,*
   148 F.3d 1355 (Fed. Cir. 1998) ........................................................... 21

*Rite-Hite Corp. v. Kelley Co.,*
   56 F.3d 1538 (Fed. Cir. 1995) ............................................................. 15

*Schering Corp. v. Roussel-UCLAF SA,*
   104 F.3d 341 (Fed. Cir. 1997) ............................................................. 15

*Shaffer v. Heitner,*
   433 U.S. 186 (1977) ............................................................................. 18

GCA Law Partners LLP
1891 Landings Drive
Mountain View, CA 94043
(650)428-3900

*Trinitech Industries, Inc. v. Pedre Promotional Products, Inc.*,
     395 F.3d 1275 (Fed. Cir. 2005) ............................................................ 17, 19

*Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*,
     944 F.2d 870 (Fed. Cir. 1991) ............................................................ 15

*Warner-Jenkinson Co. v. Hilton Davis Chem..*,
     520 U.S. 17 (1997) ............................................................ 12


<u>Codes and Statutes</u>                                                        <u>Page No.</u>

CAL. CIV. PROC. CODE § 410.10 ............................................................ 18

Fed. R. Civ. P. 12(b)(1) ............................................................ 1

Fed. R. Civ. P. 12(b)(2) ............................................................ 1, 17

Fed. R. Civ. P. 12(b)(7) ............................................................ 1

35 U.S.C. §112 ............................................................ 12

GCA Law Partners LLP
1891 Landings Drive
Mountain View, CA  94043
(650)428-3900

## **INTRODUCTION**

Defendant Aeromechanical Services Ltd. ("AMS") attempts to escape responsibility for infringing Plaintiff Star Navigation Systems Group Ltd.'s ("Star's") transportation vehicle monitoring patent, U.S. Patent No. 7,113,852 (the "'852 patent") by seeking dismissal of Star's First Amended Complaint.  In support of its motion, AMS offers arguments and testimony that create a jurisdictional record characterized by incomplete information and evidentiary gaps.

AMS first disputes Star's standing to sue in its own name, pursuant to Fed. R. Civ. P. 12(b)(1), based on arguments that Plaintiff's exclusive license precludes this suit and covers a limited field of use.  But that license grants to Star all substantial rights in the patent-in-suit, including the right to bring the instant action without the licensor-inventors' participation.  The alleged restriction in the license with regard to "Transportation Applications" does not limit Star's rights to practice the '852 patent because the patent covers only "transportation vehicles," by its plain claim terms.

AMS next argues that two inventors are indispensable parties that must be joined as party-plaintiffs to prevent multiple lawsuits under Fed. R. Civ. P. 12(b)(7).  Yet both inventors declined to sue AMS, while authorizing Star to file this suit pursuant to the terms of the license.

AMS also claims that this Court cannot exercise personal jurisdiction over AMS because it lacks contacts to California, requiring dismissal pursuant to Fed. R. Civ. P. 12(b)(2).  The substantive evidence proffered by AMS  - the testimony of its President, Darryl Jacobs – is not credible and should be addressed by Star after conducting jurisdictional discovery.  Nevertheless, Star presents evidence below that personal jurisdiction exists, *inter alia*, due to AMS' (1) active product distribution to registered California businesses operating regularly at state airports and (2) regular, ongoing communications necessary for use of the accused system within the State.

- 1 -

Finally, AMS claims that it should receive an award of attorney's fees for "reviewing and responding to the First Amended Complaint." Such an award is unwarranted.

For the reasons below, AMS' motion should be denied in its entirety. If this Court requires a more complete evidentiary record, Star respectfully requests leave to conduct jurisdictional discovery and to continue the hearing date, as proposed in Argument section IV.

## ISSUES TO BE DECIDED

1. Whether exclusive licensee Star has standing to sue where the inventors granted all substantial patent rights, including the right to enforce the patent and a field of use that encompasses all substantial rights under the patent-in-suit.

2. Whether Star must amend its Complaint to add the inventors as parties where both inventors granted Star all substantial patent rights under an exclusive license and authorized Star to file this suit on its own when declining to participate as individual party-plaintiffs.

3. Whether personal jurisdiction exists, *inter alia*, in light of AMS' active product distribution to registered California businesses that operate regularly at numerous state airports and its regular, ongoing communications necessary for use of the accused system within the State.

4. Whether this Court should grant Plaintiff leave to conduct jurisdictional discovery and continue the hearing on Defendant's Motion to Dismiss until jurisdictional discovery is completed and the jurisdictional issues have been fully briefed.

## STATEMENT OF RELEVANT FACTS

### A. Plaintiff Star and its Patented Technology

Plaintiff Star is a Canadian corporation, with its principal place of business in Toronto, Ontario Canada. First Amended Complaint ("Compl.") ¶ 1. On September 26, 2006, United States Patent No. 7,113,852 ("the '852 patent"), entitled "System and Method for Transportation Vehicle Monitoring, Feedback and Control" was duly and legally issued to Viraf S. Kapadia and Hilary Vieira. Compl. ¶¶ 6, 7. *See* Exhibit ("Exh.") 1 to Declaration of Jeffrey K. Lee ("Lee Decl."). The invention encompasses "methods for *transportation vehicle* operation, performance and condition

- 2 -

monitoring and feedback." Lee Decl., Exh. 1 at 1:14-1:17 (emphasis added; stating "field of the invention").    Accordingly, all claims of the '852 patent include a "transportation vehicle" as an element.  *See* Lee Decl., Exh. 1 at 32:23-38:34 (stating patent claims).

### 1. Star's Full and Exclusive Rights to The '852 Patent

Viraf S. Kapadia and Hilary Vieira ("the Licensors") granted Star an exclusive license of all substantial rights in the '852 patent under a license agreement dated April 22, 2002 ("the License"). Compl. ¶¶ 6, 7.  *See* Lee Decl., Exh. 2. The License grants all rights to practice the '852 patent, as well as separate rights in other property, trademarks, and know-how.  *See* Lee Decl., Exh. 2 at ¶2.2(a)-(c) (granting rights, *inter alia*,  to "use, develop, produce, . . . market, promote, and sell") and Schedule A (listing patents and trademarks).  The License specifically gives Star exclusive rights to all "Transportation Applications," thus granting the full scope of rights in the '852 patent.[1]  *See* Lee Decl., Exh. 2 at ¶2(m) (using title terms of '852 patent in defining "Transportation Applications" as "all applications of the Licensed Property to *vehicle monitoring*, *feedback* and *control* or in connection with the transportation industry, including railroad, automobile, trucking and aviation, . . . 'vehicle' will include automobiles, trucks, trains, aircraft and ships of any kind.").

### 2. Star's Right to Sue In Its Own Name and the Instant Action

The License also grants Star the right to prosecute infringement actions in its own name, without the Licensors' participation, where they decline to file suit.  *See* Lee Decl., Exh. 2 at ¶¶ 10.1 and 10.2.  Under these terms, Star Navigation advised Mr. Vieira of AMS' infringement of the '852 patent in a letter from Mr. Kapadia, dated March 8, 2007.  *See* Lee Decl., Exh. 3.  Mr. Vieira, through

---

[1]  The License is identified in a Canadian employment dispute brought by Mr. Vieira in which Star disputes termination of the agreement and counterclaimed against Mr. Vieira for breach of contract on September 4, 2007.  *See* Lee Decl., Exh. 5 (Star's Canadian pleading) at ¶¶ 82-83 (Star defense of License termination allegation) and ¶ 90 (Star counterclaim against Vieira).

Case No. C 07-4820 (MMC)
Plaintiff's Mem. P's and A's in Opp'n to Second Motion to Dismiss

his lawyer Frances M. Wood, declined to sue, authorizing Star to sue AMS on its own behalf in a letter dated April 5, 2007. *See* Lee Decl., Exh. 4.

On September 19, 2007, Star filed the present action, amending its complaint on December 18, 2007. Star seeks to stop infringement of the '852 patent through AMS' importing, making, selling, using, operating, supporting, or offering to sell infringing devices and/or systems, including AMS's Automated Flight Information Reporting System model 200, ("AFIRS" or the "Infringing System"). Compl. ¶¶ 8-9. AMS is also inducing or contributing to infringement of the '852 patent by others by selling and/or offering to sell the Infringing System to third parties, with the intent to induce infringement. Compl. ¶¶ 8-9. Plaintiff alleges that "AMS is doing business and has committed acts of infringement, including those alleged herein, within the State of California and/or this judicial district, subjecting it to the jurisdiction of this Court and making venue proper in this district pursuant to 28 U.S.C. §§ 1391 and 1400." Compl. ¶ 4.

B. **Defendant AMS and its Contacts to California**

Defendant AMS is a Canadian corporation with its place of business in Calgary, Alberta Canada.[2] Compl. ¶ 2. AMS maintains a corporate website at www.amscanada.com, advertising its products and services to investors, customers, and potential customers of AMS, including any in California. Public information shows that AMS operates at least one U.S. subsidiary,

---

[2]  Although Darryl Jacobs contends in paragraph 3 of his declaration that AMS has "its principal place of business (*and only offices*) in Calgary, Alberta, Canada (emphasis added)," the company and he, as its president, publicly reported in 2004, 2005 and 2006 Annual Reports that AMS has an office in League City, Texas. *See* Lee Decl., Exhs. 30 at 9 (signature) and 53 (offices); 31 at 3 (signature) and 40 (offices); and 34 at 5 (signature) and 25 (offices). Moreover, his testimony appears to focus only on AMS and the accused system, while failing to completely address likely jurisdiction-invoking actions of its other products and wholly-controlled subsidiaries and partners. Mr. Jacobs' testimony in support of AMS' attempt to avoid this lawsuit is inaccurate, incomplete and self-serving. It is simply not credible. It should be discounted for purposes of this Motion and, at a minimum, addressed through jurisdictional discovery.

- 4 -

AeroMechanical Services USA, Inc. *See* Lee Decl., Exh. 6. AMS also identified Flyht Corporation, a wholly-owned subsidiary, as responsible for sales and marketing for AMS "service agreements, product sales and part supply." *See* Lee Decl., Exh. 30 at 1 and 32. Other AMS subsidiaries and partners relevant to this case may be identified through jurisdictional discovery.

### 1. **AMS' Publicly-Known Products and Support Services**

AMS's public website states that it offers its AFIRS solution and provides storage, cabin cleaning, and safety solutions for the transportation industry. *See* Lee Decl., Exh. 7.

***The Infringing AFIRS product*** - AMS's AFIRS system operates as an aircraft monitoring aid, including for commercial passenger craft crossing the Pacific Ocean into California from Hawaii, Asia, and beyond. AMS claims 26 air carriers as current AFIRS customers. *See* Lee Decl., Exh. 48 at 2. In a December 21, 2007 press release, announcing a new (unidentified) customer, AMS Chief Executive Officer Bill Tempany acknowledged AMS' extensive business contacts: "Our products are connecting our clients around the globe, from the North Pole to the South Pole and from Hawaii to Africa and Asia Pacific *and all points between.*" *Id.* (emphasis added). AMS reported "This brings the contracted aircraft in 2007 to 507 at 17 airlines. These 3 additions increase the total aircraft under contract to 684 from 26 different carriers. There are currently more than 90 aircraft that are equipped for the afirs™ UpTime™ solution." *Id.*

***AMS' other products and services*** – Other established AMS products for the aviation industry include cabin cleaning systems and under-floor stowage units. *See* Lee Decl., Exhs. 7, 30, 31.

***Product Installation and Support Services*** – AMS' website acknowledges its product support services, available anywhere in the world: "At AMS, we pride ourselves on outstanding customer service, efficient installation, and exceptional technical support." Lee Decl., Exh. 9. AMS promises

- 5 -

"efficient installation" of its product, stating "[w]orking within the airlines' schedules, AMS provides on-site installation *anywhere in the world*." *Id.* (emphasis added).

*Necessary Communications Between AMS and Airplane Operators* – AMS supports its customers with communications through its "web-based client interface," usable by customers anywhere – including California - and a remote access technician to aid them.   *See* Lee Decl., Exh. 9 ("Our easy-to-use web-based *client interface* allows *airline staff* to produce reports and access data quickly and easily without relying on technical staff. Our UpTime servers are housed off-site and managed by IBM . . . . If necessary, AMS retains a remote-access technician available 24/7.").

Publicly-available evidence indicates that ongoing communications through this "client interface" are necessary to AFIRS.  AFIRS servers obtain flight data and provide performance reports for airplane flight and maintenance crews needing immediate aviation system evaluations, presumably including when at California airports. The system disclosed by AMS' own patent gathers and transmits information onboard the airplane. *See* Lee Decl., Exh. 10 at 1:12-1:14 (AMS invention "relates to an aircraft flight data management system and, more particularly, to an *on-board data acquisition, storage and transmission system*.").  Either manually (through human action) or automatically (through pre-programmed events such as upon engine shutdown), flight data is formatted on the airplane and transmitted – including from the airplane at touchdown and takeoff locations – to AMS servers. *See* Lee Decl., Exh. 10 at Figure 6 (showing data report produced to client after touchdown).  Data reports are then created by AMS servers and re-directed back to the on-site airplane operations personnel, airport maintenance crews, flight crews, and/or any person evaluating the airplane's system performance. *See* Lee Decl., Exh. 10 at 6:3-44 (describing transmission of client data to AMS and retransmission of report to the "aircraft crew" onboard the aircraft) and Exh. 30 at 11.  Such information is contemplated for use in a "real-time" environment to

- 6 -

evaluate aircraft performance and prepare the craft for its departing flight, when other transmissions

occur between the client's crews and AMS. *See* Lee Decl., Exh. 36 at 3 (describing client interface

upon aircraft takeoff). These communications appear to occur at touchdown and/or takeoff wherever

an AFIRS-equipped aircraft travels, including at the California airports identified below.

### 2. **AMS' Publicly-Known Customers**

AMS targets sales to aviation original equipment manufacturers ("OEMs"), large and small

aviation operators (both military and private) and aviation craft maintenance companies, among

others. *See* Lee Decl., Exhs. 11; 17; 32; 37 at 1; 33 at 1; 30 at 3-10; 31 at 3; and 39 (military use of

AFIRS by Raytheon of Long Beach, California). Several presently-known AMS airline customers

are registered as active California corporations that maintain operations centers and/or flight routes

into and out of the State. There exists no dispute that at least one of AMS' products - its AFIRS

system - enters California regularly when installed in aircraft of these customers.

Public information indicates that AMS installs and provides ongoing system support services

customers wherever requested. AMS's solicitation, sales, installation and service of its AFIRS

system (and other products) may occur in California at any location with any aviation customer.

Jurisdictional discovery is needed to determine the extent of such state contacts, including with the

following.

*Aloha Airlines* - AMS' business within California includes sale of, installation and ongoing

service for its Infringing Product to Aloha Airlines for use on its fleet of commercial airplanes. *See*

Lee Decl., Exh. 35 at 2. Aloha Airlines, Inc. is an active, registered California business. *See* Lee

Decl. ¶ 16 and Exh. 12. Aloha sends its commercial airplanes across the Pacific Ocean in and out of

at least four California airports, including Sacramento, Oakland, San Diego, and John Wayne (Orange

County, California). *See* Lee Decl., Exhs. 13 at 3, 34 at 2. As discussed above, data transmissions to

- 7 -

and from AMS seem to occur to generate AMS' report on the plane's system performance after landing and/or before a departing flight at these state airports. Moreover, AMS's installation and service of its AFIRS system may occur in California, including at airports to which Aloha flies. Jurisdictional discovery is needed to determine the extent and scope of such state contacts.

*China Eastern Airlines* - AMS' business within California further includes sale of, installation and service for its infringing product to China Eastern Airlines for use on its fleet of airplanes. *See* Lee Decl., Exh. 14. China Eastern Airlines Co. Ltd. is another active, registered California business. *See* Lee Decl., ¶ 19 and Exh. 15. China Eastern also sends its airplanes across the Pacific Ocean in and out of California, including LAX airport in Los Angeles. *See* Lee Decl., Exh. 16. As discussed above, data transmissions to and from AMS by the flight personnel likely occur at state airports. Moreover, AMS's installation and service of its AFIRS system may occur in California at any of the airports to which China Eastern flies. Jurisdictional discovery is also needed to determine the extent and scope of such state contacts.

*Meggitt Purchase and Installation of AMS' Systems in California* – AMS advertises a strong relationship with Meggitt, PLC, comprised in part of active, registered California businesses with headquarters and/or operations in Simi Valley, California. *See* Lee Decl., ¶ 23 and Exh. 19. *See also* Lee Decl., Exhs. 30 at 6; 17; 18; 20 at 1-2; 36; and 38 at 4. Meggitt manufactures and sells aviation equipment, including (as advertised by AMS) systems incorporating the AFIRS solution. *See* Lee Decl., Exhs. 17, 18, 20. A November 21, 2007 report highlighted AMS's relationship with Meggitt as "allowing AeroMechanical to work directly with OEM's (Original Equipment Manufacturers ex: Boeing, Airbus, etc) to have its products installed directly on the airframe and thus reduce installation time." Lee Decl., Exh. 20. The extent of AMS and/or OEM sales, installation,

- 8 -

promotions and service of the Infringing System (and other AMS products) within California, including by Meggitt, is presently an issue for jurisdictional discovery.

### 3. AMS' Potential California Customers

The November 21, 2007 market report found the market potential for AMS' AFIRS solution as "immense" with respect to almost 40 thousand commercial and business aircraft in operation and 51 thousand when including turboprops." *See* Lee Decl., Exh. 20. Apart from AMS' acknowledged large-scale commercial passenger airline customers, the company may solicit, promote, offer, sell, and/or support the Infringing System or its other products to small, independent aviation craft (airplanes, helicopters, etc.) customers. *See* Lee Decl., Exh. 30 at 4 (discussing general and helicopter OEMs as customers). Numerous large and small aviation craft operators, manufacturers and maintenance companies reside and operate in California, creating a significant customer base for AMS, its subsidiaries, or partners to solicit. *See* Lee Decl., Exhs. 21, 40.

To aid in marketing, AMS' website promotes its AFIRS solution to small, commercial and business aircraft by recounting the Indian Air Force's use of the system on a worldwide flight in a "microlight" aircraft that followed a route through California, including Stockton and Tracy. *See* Lee Decl., Exh. 23 at 6-7. Third-parties also identified the system's use when installed on small-scale aircraft. *See* Lee Decl., Exhs. 23, 24, and 37.

AMS' opportunities for contacts with California resident customers seem to arise regularly. AMS appears to have attended recent conferences with numerous airline customers and/or potential customers in attendance, including commercial flight operators and airplane manufacturers. *See, e.g.,* Lee Decl., Exhs. 30 at 1 (describing March 2007 conference "attended by all the major aircraft manufacturers, leasing companies, industrial banks from around the world and most of the leading

- 9 -

airlines in the world"); 25 at 6; 26 at 6.  AMS or its subsidiaries' contacts with current or potential

California customers may thus occur frequently.  Those contacts may only be learned in discovery.

### C.  The Parties' Negotiations Regarding Jurisdictional Discovery and Scheduling.

On December 10, 2007 lead trial counsel for Star contacted AMS counsel to discuss an

agreement to conduct jurisdictional discovery, scheduling of Star's response, and continuation of the

hearing on AMS' First Motion to Dismiss.  *See* Lee Decl. at ¶ 31 and Exh. 27.  Star also provided a

Notice of Deposition and Requests for the Production of Documents and Things directed to

jurisdictional issues.  *See* Lee Decl. at ¶ 31 and Exh. 27 (attaching discovery requests).

On December 13, 2007, hearing nothing, Star reiterated its request and the need for a timely

response.  *See* Lee Decl., Exh. 28.  On December 14, 2007, AMS offered only a single deponent for a

short deposition and sought to severely restrict the scope of discovery.  *See* Lee Decl., Exh. 29.  Star

filed its First Amended Complaint on December 18, 2007.  *See* Lee Decl., Exh. 41.  On December 21,

2007, AMS filed this Second Motion to Dismiss while Star filed its opposition to the First Motion to

Dismiss.  On December 27, 2007, after Star's request, AMS formally withdrew its First Motion to

Dismiss.  *See* Lee Decl., Exhs. 44 and 45.

On January 2, 2007, Star modified its jurisdictional discovery requests and served a revised

Notice of Deposition and Requests for the Production of Documents and Things directed to

jurisdictional issues.  *See* Lee Decl. at ¶ 50 and Exh. 46.  As of this filing, AMS has refused to allow

jurisdictional discovery requested by Star.  *See* Lee Decl., Exhs. 43 and 48.

- 10 -

# ARGUMENT

**I.   STAR HAS STANDING TO SUE ON ITS OWN BECAUSE THE INVENTORS GRANTED ALL SUBSTANTIAL PATENT RIGHTS AND AMS' SO-CALLED "FIELD OF USE" ENCOMPASSES THE FULL SCOPE OF THE PATENT.**

Defendant challenges Star's standing to sue by maintaining that Licensors Kapadia and Vieira retained all "non-Transportation Applications" of the '852 patent and therefore granted fewer than all substantial patent rights to Star. AMS Mem. at 11-12. AMS concludes that the Licensors must therefore be joined as parties to the litigation. However, AMS ignores that the '852 has no "non-Transportation Applications" and that the Licensors authorized Star to sue by itself when they elected not to proceed themselves.

**A.   The Patent Owner Must Be Joined Only If an Exclusive Licensee Receives Fewer Than All Substantial Patent Rights.**

"An exclusive licensee has standing to sue in its own name, without joining the patent holder, where 'all substantial rights' in the patent are transferred." *Int'l Gamco, Inc. v. Multimedia Games, Inc.*, 504 F.3d 1273, 1276 (Fed. Cir. 2007). The patent owner must be joined, either voluntarily or involuntarily, only if the exclusive licensee grants fewer than all substantial patent rights. *Intellectual Prop. Dev. Inc. v. TCI Cablevision of Calif., Inc.*, 248 F.3d 1331, 1347 (Fed. Cir. 2001). An exclusive licensee with the unlimited right to make, use, sell, and sublicense the patents-in-suit, while the licensor retains no such rights, has "all substantial rights." *Applied Interact, LLC v. Vt. Teddy Bear Co.*, 2005 U.S. Dist. LEXIS 15016 (S.D.N.Y. Sept. 6, 2005).

**B.   Star Is The Exclusive Licensee Holding All Substantial Rights in the '852 Patent.**

AMS claims that Star does not have all substantial rights in the '852 patent. *See* AMS Mem. at 11-13. But the License terms establish Star as the exclusive licensee holding all substantial patent rights, including the right to sue infringers in its own name.

- 11 -

As discussed above, the License grants Star the right to fully practice the '852 patent. *See* Lee Decl., Exh. 2 at ¶ 2.2 (granting rights, *inter alia*, to "use, develop, produce, . . . market, promote, and sell" the patented invention)  The License also grants certain rights to property, trademarks and know-how as applied to transportation applications. *See* Lee Decl., Exh. 2 at ¶ 2.2(a)-(c).  As consideration for these grants, Star gave the Licensors 2,000,000 common shares in the company. *See* Lee Decl., Exh. 2 at ¶ 8.1.  Provisions regarding Star's use of best efforts, inspections, quality control, company operations, and other terms exist to protect the financial interests of the Licensors, thus ensuring value in the shares given for consideration. *See, e.g.,* Lee Decl., Exh. 2 at ¶¶ 5.1-5.9.

### 1.    No Field of Use Limits Star's Right to Practice The '852 Patent.

AMS argues that Star's supposed "field of use" granted by the License, is limited to "Transportation Applications" of the patent.  AMS Mem. at 11-12. However, assuming, *arguendo*, that such a "field of use" exists, that "field" covers the entire '852 patent.

The scope of any patent is limited by its claims. 35 USC § 112.  Infringement exists only when the accused product, system, or process contains all elements in those claims, whether identical or equivalent. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997).

As discussed above, a necessary element contained in all independent claims of the '852 patent, including asserted claim 23, is a "transportation vehicle." *See* Lee Decl., Exh. 1 at 32:23-38:34.[3] AMS' alleged infringement must involve some connection with a "transportation vehicle." This common element makes AMS' so-called non-transportation "limitation," truly a non-limitation with regard to the '852 patent.  Because the '852 patent's claims encompass "transportation vehicles," the Licensors could not retain *patent* rights to a "field of use" for "non-transportation applications."

- 12 -

AMS confuses the scope of the grant of patent rights by ignoring that the Licensors conveyed non-patent rights to Star. *See* Lee Decl., Exh. 2 at ¶ 1.1(f) ("License" means rights over Licensed Property, Patents, Trademarks, and Know-How) and ¶ 1.1(h) ("Licensed Property" includes both patent and trademark rights).  Although the Licensors limited these non-patent rights transferred through the License, they did not retain substantial rights under the '852 patent.  AMS has no basis to argue that any such limitations on trademark and other intellectual property rights for conceivable "non-transportation" applications prevent Star from practicing the "transportation vehicle" invention claimed by the '852 patent.  Accordingly, a plain reading of the License and '852 patent reveals that no "non-transportation" field of use exists for the Licensors to retain.[4]

**2.     Security and Commercial Provisions Do Not Limit Star's Patent Rights.**

AMS postulates that provisions in the License regarding the use of best efforts, inspections, license termination, and commercial quality standards show fewer than all substantial rights were granted to Star.  AMS Mem. at 12-13.  But these are common security and commercial provisions that do not undermine Star's status as the exclusive licensee holding all substantial rights in the '852 patent.  Such security provisions are typically used to protect the licensors' financial interests and do not change the patent rights granted under a license.  *See, e.g., McNeilab, Inc. v. Scandipharm, Inc.*, 1996 U.S. App. LEXIS 19073, 9-10 (Fed. Cir. 1996) ("The right of the patentee to terminate the license in the event of the licensee's failure of performance does not negate the substantiality of the exclusive transfer of all rights to make, use, and sell the licensed product.");  *InternetAd Sys., LLC v. Opodo Ltd.*, 481 F. Supp. 2d 596, 610 (N. D. Tex. 2007) (exclusive license granting all substantial

---

[3]  In addition to the common "transportation vehicle" claim element, the '852 patent specification clearly states that the invention "relates to methods and systems for *transportation vehicle* operation, performance and condition monitoring and feedback."  *See* Lee Decl., Exh. 1 at 1:15-1:17.

- 13 -

1  rights existed despite imposition of commercial conditions on licensee).

2      AMS repeatedly equates Star's License with the agreement in *Propat Int'l Corp. v. RPost US,*

3  *Inc.*, 473 F.3d 1187 (Fed. Cir. 2007).  AMS Mem. at 10, 13.   But unlike Star's License – granting

4  rights, *inter alia*, to "use, develop, produce, . . . market, promote, and sell" - the agreement in *Propat*

5  *Int'l Corp.*, withheld those rights, transferring only the right to enforce or license the invention.  *See*

6  *Propat*, 473 F.3d at 1190 and 1194 ("[I]t appears from the agreement that the parties did not envision

7  that Propat would practice the patent, but instead contemplated that Propat would be involved only in

8  licensing and litigation.").  The *Propat* court, also found important that the licensor retained the

9  substantial rights (1) to certain proceeds of licensing and litigation activities while the agreement was

10 effective, (2) to terminate the agreement upon Propat failing to meet "certain specified benchmarks in

11 its efforts to exploit the patent," and (3) to "arbitrarily" veto any transfer of Propat's rights under the

12 agreement.  *Propat*, 473 F.3d at 1191-92.  In contrast, Star's Licensors retained none of these rights.

13 *See* Lee Decl., Exh. 2 at ¶ 8.1 (consideration for grant of license rights is 2,000,000 common shares of

14 Star); ¶ 5.3 (Star obligation only to use "best efforts to market and promote" Licensed Property); and

15 ¶ 2.7 (giving Star the right "to grant others the Licence [sic] granted to it . . . .").  The agreement in

16 *Propat* constituted a "bare license," withholding these basic patent rights.  AMS' comparison between

17 Star's License and that in *Propat* are unfounded.

18     AMS cites other cases involving agreements that impose sets of limitations on the grantees'

19 rights that simply do not exist here. *See Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1336 (Fed. Cir.

20 2007) (Plaintiff lacked ownership interest in the patent-in-suit where another party held exclusive

21 right to license and collect royalties.); *Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.*,

---

4   Non-Transportation Applications for certain trademarks or Know-How may exist.  But, a "non-transportation vehicle" that AMS conjures is oxymoronic.  It cannot exist.

Case No. C 07-4820 (MMC)
Plaintiff's Mem. P's and A's in Opp'n to Second Motion to Dismiss

248 F.3d 1333, 1337 (Fed. Cir. 2001) (Licensee suffered restrictions on right to sue for infringement including (1) need to notify and consult with licensor before initiation of litigation , (2) need to obtain licensor's consent to any settlement licensee may enter, (3) need to obtain licensor's consent to join the licensee in suit if licensor was a necessary party, and (4) licensor's option to withdraw such consent at any time.); *Int'l Nutrition Co. v. Horphag Research Ltd.*, 257 F.3d 1324, 1330 (Fed. Cir. 2001) (Plaintiff owned at best only 50% of patent); *Ethicon, Inc. v. United States Surgical Corp. 135 F.3d 1456, 1472* (Fed. Cir. 1998) (license grant was by only one co-owner)*; Schering Corp. v. Roussel-UCLAF SA*, 104 F.3d 341, 345 (Fed. Cir. 1997) (Plaintiff was mere co-owner); *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1552 (Fed. Cir. 1995) (License for an exclusive sales territory); *Int'l Gamco, Inc.*, 504 F.3d at 1279 (Fed. Cir. 2007) (License imposed both geographic and field of use restrictions.); *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*, 944 F.2d 870, 875 (Fed. Cir. 1991) (Licensor retained (1) veto right for sublicensing, (2) rights to patents in other countries, (3) a reversionary right, and (4) a right to infringement damages); *Aspex Eyewear, Inc. v. Miracle Optics, Inc.*, 434 F.3d 1336, 1342 (Fed. Cir. 2006) (five-year term limit); *Mentor H/S, Inc. v. Med Device Alliance*, 240 F.3d 1016, 1018 (Fed. Cir. 2001) (Licensor retained the (1) right to manufacture products under the patent, (2) responsibility to maintain patents, and (3) obligation to sue for infringement.). Star's License does not embody any of those specific situations.  Accordingly, unlike the limited licensees in those cases, Star holds all substantial patent rights.

### 3.   Mere Allegations in the Canadian Litigation Cannot Terminate the License.

Finally, AMS' contention that the Canadian case precludes Star's standing to sue by invalidating the License is just that -- a contention -- and would require this Court to make legal and factual conclusions to dismiss this case.   AMS Mem. at 14-15. That litigation addresses an employment dispute involving claims unrelated this proceeding and that are being contested by Star.

- 15 -

*See* Lee Decl., Exh. 5 at ¶¶ 82-82 and 90.  Even if relevant, the License termination allegations

parroted by AMS remain disputed by Star, unproven, and unaddressed by that court. *See id.*  No

finding of license invalidity has been made there.  Moreover, a variety of circumstances might arise -

as in any litigation - to prevent that court from considering the allegations AMS relies upon here.[5]

**C.    Neither Inventor Is Indispensable Because Both Authorized Star to File This Suit Pursuant to the Terms of the License and Declined to Participate as Individual Party-Plaintiffs.**

AMS argues that the Licensors are indispensable parties that must be joined in this action.

AMS Mem. at 13, 14-15.  But Messrs. Kapadia and Vieira authorized Star to prosecute the present

infringement action without their participation.  As discussed above, paragraphs 10.1 and 10.2 of the

License agreement allow Star to bring an action for infringement without the Licensors.  *See* Lee

Decl., Exh. 2.  Star Navigation advised Mr. Vieira of AMS' infringement on March 8, 2007. *See* Lee

Decl., Exh. 3.  On April 5, 2007, Mr. Vieira waived his right to sue, authorizing Star to sue AMS on

its own behalf.  *See* Lee Decl., Exh. 4.

Neither Licensor is indispensable.  Both have exercised their respective rights and elected not

to sue AMS to enforce the '852 patent. Neither inventor will bring suit without Star.  There is

therefore no danger to AMS of multiple patent infringement suits.  The License provides no right

allowing the Licensors to commence a subsequent suit arising from the same operative facts giving

rise to the present infringement action.  However, to the extent that the Court believes one or both

inventors should be parties to this action, Star requests leave to amend its Complaint accordingly.[6]

---

[5]    AMS presents no argument or request that this Court abstain or stay its proceedings in favor of that foreign tribunal's adjudication.

[6]    AMS' request for dismissal is unwarranted.  Exclusive licensee Star may enforce the patent despite an unwilling or unavailable patent owner. A patent owner is "duty bound to become a party." *Independent Wireless Telegraph Co. v. Radio Corp. of Am.*, 269 U.S. 459, 472 (1926). A licensee

- 16 -

## II. PERSONAL JURISDICTION EXISTS DUE TO AMS' ACTIVE PRODUCT DISTRIBUTION TO REGISTERED CALIFORNIA BUSINESSES OPERATING AT STATE AIRPORTS AND REGULAR, ONGOING COMMUNICATIONS NECESSARY FOR USE OF ITS ACCUSED SYSTEM WITHIN THE STATE.

AMS' motion to dismiss for lack of personal jurisdiction is governed by Fed. R. Civ. P. 12(b)(2).  District courts are bound by the law of the Federal Circuit on matters of personal jurisdiction involving patent claims.  *Elecs. For Imaging, Inc. v. Coyle*, 340 F.3d 1344, 1348 (Fed. Cir. 2003); *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1564-65 (Fed. Cir. 1994); *Akro Corp. v. Luker*, 45 F.3d 1541, 1543 (Fed. Cir. 1995); *Breckenridge Pharm., Inc. v. Metabolite Labs., Inc.*, 444 F.3d 1356, 1361 (Fed. Cir. 2006).  Where no jurisdictional discovery has occurred, a plaintiff need "'only to make a prima facie showing' of jurisdiction to defeat the motion to dismiss." *Trinitech Industries, Inc. v. Pedre Promotional Products, Inc.*, 395 F.3d 1275, 1282 (Fed. Cir. 2005) (citations omitted). The district court "must construe all pleadings and affidavits in the light most favorable to the plaintiff." *Id.* at 1282-83 (citations omitted).

Personal jurisdiction over AMS may be established under Constitutional standards.[7]  The United States Constitution requires that a foreign defendant have such contacts with the forum state that maintaining the action would not offend "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).  The Supreme Court set forth

---

"may make [the patent owner] a party defendant by process and he will be lined up by the court in the party character which he should assume." *Abbott Labs. v. Diamedix Corp.*, 47 F.3d 1128, 1131(Fed. Cir. 1995) (quoting *Independent Wireless*, 269 U.S. at 468). A patentee "holds the title to the patent in trust for [the exclusive] licensee, to the extent that he must allow the use of his name as plaintiff in any action brought at the instance of the licensee in law or in equity to obtain damages for the injury to his exclusive right by an infringer or to enjoin infringement of it." *Id.* Even in the absence of an expressed provision, courts will imply an "obligation" on the "licensor to allow the use of his name" so that the licensee may enjoy "the monopoly which by personal contract the licensor has given." *Independent Wireless*, 269 U.S. at 469.

- 17 -

Constitutional standards for both general and specific jurisdiction in *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414-15 (1984). Principles of general jurisdiction dictate that a party may be subject to suit on all claims in a forum, wherever they arise, when that defendant has "continuous and systematic" contacts with the forum state whether or not those contacts relate to the cause of action. *Helicopteros*, 466 U.S. at 414-15. Specific jurisdiction is assessed by the "relationship among the defendants, the forum and the litigation." *Shaffer v. Heitner*, 433 U.S. 186, 204 (1977).

Star has presented prima facie public evidence above supporting the exercise of specific personal jurisdiction over AMS, including that (1) AMS' Infringing Systems enter the forum regularly and at numerous entry points due to Star's distribution to registered California companies and (2) AMS obtains and directs necessary communications from and to its resident California customers.

AMS actively distributes at least its AFIRS product to registered California businesses Aloha and China Eastern Airlines that operate regular flights to and from numerous state airports, including within this judicial district.  As described above, AMS necessarily obtains and directs ongoing communications necessary for use of its system from and into the airline flight and/or maintenance crews at airports when and where those customers land and take-off.

AMS also maintains a product installation and distribution relationship with Meggitt PLC, comprised in part of several California registered and resident companies that maintain domestic operations and/or headquarters in California.  Moreover, AMS admits on its website that it sells, installs, services and supports its products for its transportation customers, including via the company's web-based service accessible by customer personnel, "24/7" and "anywhere in the world."

---

[7]    *See* California Code of Civil Procedure § 410.10 ("A court of this state may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States.").

Case No. C 07-4820 (MMC)
Plaintiff's Mem. P's and A's in Opp'n to Second Motion to Dismiss

1    At least two such customers, Aloha and China Eastern Airlines, enter and appear to maintain

2    operations and staff in California airports, to which AFIRS-equipped airplanes fly.

3
     **III.  PLAINTIFF SHOULD BE GRANTED EXPEDITED JURISDICTIONAL DISCOVERY**
4        **TO SUPPLEMENT THE RECORD.**

5        Federal Circuit caselaw further governs jurisdictional and other discovery where substantive

6
     patent law is involved.  *Commissariat a l'Energie Atomique v. Chi Mei Optoelectronics Corp.*, 395
7
8    F.3d 1315, 1323 (Fed. Cir. 2005) ("*Chi Mei*") (vacating dismissal and remanding for jurisdictional

9    discovery and reconsideration).  The Federal Circuit directs district courts entertaining patent claims

10   to allow jurisdictional discovery as appropriate "where the existing record is 'inadequate' to support

11   personal jurisdiction and 'a party demonstrates that it can supplement its jurisdictional allegations
12
     through discovery."  *Trinitech*, 395 F.3d at 1283 (citations omitted).  A plaintiff makes a sufficient
13
14   threshold showing to merit jurisdictional discovery when "factual allegations *suggest the possible*

15   *existence* of requisite contacts between the defendant and the forum state with 'reasonable
16
     particularity.'"[8]  *Chi Mei*, 395 F.3d at 1323 (emphasis added; citation omitted).
17

18       **A.  Jurisdictional Discovery Will Allow Star to Address Specific Factual Claims and**
             **Evidence at Issue Here.**
19
20       AMS challenges this Court's exercise of personal jurisdiction based on numerous factual

21   allegations of its President, Mr. Jacobs.  Although he denies that AMS has contacts to California,

22
     _____
23   [8]  Requests for jurisdictional discovery may be made, as here, through opposition to a Rule 12(b)(2)
     motion. In *Chi Mei*, the Federal Circuit determined that the district court abused its discretion by
24   denying plaintiff's request for jurisdictional discovery as untimely when initially presented in an
     opposition to a Rule 12(b)(2) motion. 395 F.3d at 1322-23, 1324.  The court found discovery
25   warranted to evaluate defendant's "intent and purpose" to serve Delaware's market and placement of
     its product into the stream of commerce, including through marketing arrangements and use of its
26   website use as a "channel [] for providing regular advice to its customers in the forum state." *Id.* at
     1323-24 (discussing stream of commerce jurisdiction in *Asahi Metals Indus. Co. v. Superior Court*,
27   480 U.S. 102 (1987)).  Public information above establishes that AMS' marketing practices (*e.g.*,
28

                                                    - 19 -

significant gaps and missing evidence characterize the record.  Star on the other hand, presents above

numerous pieces of specific, publicly-available information showing contacts to the State that support

personal jurisdiction.  Far from constituting "bare allegations," at a minimum, AMS' evidence and

allegations present specific issues that must be addressed through jurisdictional discovery.  *See AMS*

Mem. at 20 n.16 (quoting *Pebble Beach v. Caddy*, 453 F.3d 1151, 1160 (9th Cir. 2006) (finding no

need for discovery because jurisdictional theory was insufficient and record was sufficiently

developed to rule on jurisdictional issues); but citing no Federal Circuit authority).

First, AMS appears to focus its general jurisdiction "no-contacts" argument on its sales of its

Infringing System, which is relevant to specific jurisdiction, but does not provide details of its

activities regarding its other products.  *See e.g.,* AMS Supporting Memorandum ("AMS Mem.") at 18

(denying general jurisdiction by stating "AMS . . . has not sold or offered for sale its AFIRS/UPTIME

monitoring system or otherwise supported the system in California.  Jacobs Decl., ¶¶ 15-19, 21-23.

Indeed, most of AMS' sales and most of the function of *its monitoring system* occurs outside of the

U.S. Jacobs Decl., ¶¶ 4-8, 20 and 27.").  By ignoring its other products and supporting activities,

AMS creates a gap in the evidentiary record.  Discovery is needed to address non-AFIRS business

activities related to this forum, relevant to general jurisdiction.

Second, the Jacobs declaration and AMS motion focus primarily on the present operations of

the company.  Discovery on the historical business activities of AMS, any predecessors, and its

controlled subsidiaries is highly relevant to this Court's ultimate consideration of personal

jurisdiction.

---

through Meggitt and/or subsidiaries such as Flyht), "client interface" and web-based services should
subject AMS to similar discovery.

Case No. C 07-4820 (MMC)
Plaintiff's Mem. P's and A's in Opp'n to Second Motion to Dismiss

1      Third, AMS and the Jacobs declaration provide no mention of AMS' likely forum-related

2  activities involving California-registered customers Meggitt and China Eastern Airlines, or any other

3  customers beyond Aloha (also California-registered).  Significant evidentiary gaps exist regarding

4  AMS' solicitation, services, installation and support of all of its products as they likely relate to these

5

6  and other California resident customers that should be addressed through discovery.

7      Fourth, AMS raises further questions requiring discovery by relying on *Red Wing Shoe*

8  *Company v. Hockerson-Halberstadt, Inc.*, 148 F.3d 1355 (Fed. Cir. 1998).  AMS argues that contacts

9  with California cannot exist despite AMS' customers' California business activities.  AMS Mem. at

10  17.  It claims - without context - that *Red Wing* broadly dictates that "doing business with a company

11

12  that does business in Minnesota is not the same as doing business in Minnesota."  AMS Mem. at 17

13  (quoting *Red Wing*, 148 F.3d 1361).  That court found that a defendant that sold no products and

14  merely licensed others to manufacture and sell shoes lacked contacts with Minnesota despite its

15

16  licensees contacts there because "'the *unilateral activity* of another party or third person' are not

17  attributable to a defendant."  *Red Wing*, 148 F.3d 1361 (citation omitted, emphasis added).  Yet, the

18  *Red Wing* court's rationale forces questions in the present case. For example, what influence does

19  AMS have – through contracts an otherwise - regarding the purchase, use, installation, service and

20

21  support of its AFIRS and other products with respect to its California resident customers and others

22  operating within the State, including Aloha, China Eastern Airlines and Meggitt?

23      Finally, the *Red Wing* court further stressed its consideration of contacts by a party that

24  maintained "continuing obligations" through a contractual relationship with a forum resident in the

25

26  forum state.  *Red Wing*, 148 F.3d 1362 ("What was critical was . . . contacts with that resident in the

27  forum state.").  Accordingly, *Red Wing* raises the issue of the extent of the contacts between AMS and

28  its customers within California.  For example, to what extent does AMS install, support, service, or

- 21 -

communicate with California-registered businesses Aloha and China Eastern (and other customers) through operational centers at California's airports? Also, what contacts does AMS have with Meggitt in California? The AMS papers and Jacobs declaration provide no details on such highly relevant questions. Jurisdictional discovery would address such issues for the Court.

**B. Star Is Likely to Discover Additional Evidence Supporting Personal Jurisdiction.**

Star presented evidence above showing that AMS – or its subsidiaries - may actively solicit customers from a large, untapped aviation industry client base. Potential customers include California businesses and/or involve provision of products or services into the State. Based on this evidence, Star is likely to discover additional evidence supporting specific and/or general jurisdiction, including the reasonableness and relative fairness to AMS of litigating in this Court.

Discovery is likely to reveal the extent of AMS contacts with California through its subsidiaries, AMS USA and Flyht Corporation. A district court may exercise general jurisdiction over a parent company where a subsidiary is the parent's general agent. *See Doe v. Unocal Corp.*, 248 F.3d 915, 926 (9th Cir. 2001). The agency test for personal jurisdiction over a parent company is "satisfied by a showing that the subsidiary functions as the parent corporation's representative in that it performs services that are sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services." *Id.* at 928. The "question to ask is . . . whether, in the truest sense, the subsidiar[y's] presence substitutes for the presence of the parent." *Id.* at 928-29. Here, sales, marketing, maintenance and support functions for AMS may be performed by AMS subsidiaries. Thus, Star seeks discovery to confirm whether AMS subsidiaries, including Flyht and AMS USA, "substitute[] for the presence of the parent" in California. *Id.* at 929.

- 22 -

The public information establishing that AMS provides products and services in California is not addressed in any detail by AMS' memorandum or the Jacobs declaration. Moreover, no adequate information regarding AMS' business activities and non-AFIRS related activities is available other than through discovery. To the extent further evidence supporting jurisdiction over AMS may be needed, that should be obtained through jurisdictional discovery.

## IV. PENDING DEADLINES SHOULD BE ENLARGED AND CONTINUED TO ALLOW COMPLETION OF JURISDICTIONAL DISCOVERY AND SUBSEQUENT SUBMISSION OF BRIEFS.

Star respectfully requests that the Court adopt the following schedule to allow completion of expedited jurisdictional discovery and a full briefing of the factual and legal issues presented by Defendant's Second Motion to Dismiss:

A. ***Jurisdictional Discovery***: Star requests a sixty (60) day period for jurisdictional discovery.

B. ***Expedited Discovery Schedule***: Star requests that the Court order the following:

    (1) that AMS respond to Star's Requests for Production of Documents and Things within fourteen (14) days of its decision on the present motion;

    (2) that all future responses to written discovery requests be reduced from thirty (30) days to fourteen (14) days;

    (3) that third-party responses to any Subpoena Duces Tecum occur within seven (7) days; and

    (4) that all depositions take place on seven (7) days notice.

C. ***Briefing on Defendant's Motion to Dismiss***: Star requests that the Court provide it with an enlargement of time to respond to AMS' Second Motion to Dismiss up to and including twenty-one (21) days after the close of jurisdictional discovery and provide AMS up to and including fourteen (14) days to file a reply in support of its Second Motion to Dismiss.

- 23 -

D. ***Hearing Date on Defendant's Motion to Dismiss***: Star requests that a hearing date be scheduled shortly after the close of jurisdictional discovery and complete submission of all briefing on the Second Motion to Dismiss.

## V.   AMS IS NOT ENTITLED TO ATTORNEYS' FEES FOR REVIEWING AND RESPONDING TO THE FIRST AMENDED COMPLAINT.

AMS contends that it should receive attorneys' fees for "reviewing and responding to the First Amended Complaint," arguing that Star amended its original complaint "simply to delay responding to AMS's first motion." AMS Mem. at 1, 20. *See also*, Notice of Motion at 1 (seeking attorney fees "caused by Star's failure to respond to AMS's first motion to dismiss . . . ."); AMS Mem. at 7.

But AMS presents no argument that Star lost its right to amend the original complaint "once as a matter of course" under Federal Rule 15(a)(1). Moreover, Star filed a full and timely response to AMS' First Motion and supporting evidence, clearly identifying the associated January 11, 2008 hearing date on its papers.   Having no timely response to its repeated requests since December 10, 2007 to withdraw the First Motion to Dismiss and/or to continue the hearing date, Star prepared and filed a complete response to AMS' First Motion and accompanying evidence on December 21, 2007, including a full briefing of issues raised in the First Motion, a declaration and 40 supporting exhibits, a proposed order, and a request for leave to conduct jurisdictional discovery. [9]  Star's First Amended

---

[9]   AMS – not Star - is delaying by refusing reasonable discovery on basic jurisdictional issues despite evidence of substantial contacts to California. Indeed, Star, if anyone, is the party that has incurred unnecessary, oppressive fees. AMS was served with the First Amended Complaint on December 18, 2007 at about 12:51 p.m. *See* Lee Decl., Exh. 41. It did not notify Star if would file a Second Motion that would moot the First – until Star's response date. *See* Lee Decl. Exh. 43. After causing Star to incur fees to prepare and file that response - and after Star's December 27, 2007 request – AMS withdrew its First Motion. *See* Lee Decl. Exhs. 44, 45.

- 24 -

1 Complaint simply was not filed to avoid or delay responding to AMS' First Motion to Dismiss.[10]

2 Accordingly, AMS' request for attorney fees should be denied.

3

4 **<u>CONCLUSION</u>**

5 For the foregoing reasons, Defendant AMS' Motion to Dismiss should be denied in its

6 entirety.   If the Court determines that the record is incomplete, then Plaintiff Star should be granted

7 leave to supplement its allegations through jurisdictional discovery and deadlines should be imposed

8 as proposed above.

9

10

11 Dated:   January 4, 2008                          Respectfully submitted,

12                                                   Daniel P. Albers
13                                                   Jeffrey A. Ruppel
                                                     Christine H. McCarthy
14                                                   BARNES & THORNBURG LLP

15                                                   Jeffrey K. Lee, State Bar No. 212465
16                                                   Kimberly A. Donovan, State Bar No. 160729
                                                     GCA LAW PARTNERS LLP
17
18                                                   By:   ___/s/ Jeffrey K. Lee_____.
                                                           Attorneys for Plaintiff STAR NAVIGATION
19                                                         SYSTEMS GROUP LTD.

20
21 [10] AMS cannot rely on *In re Keegan Management Co. Securities Litigation*, 78 F.3d 431 (9th Cir.
22 1996).  There, the Ninth Circuit determined that imposition of sanctions for filing an initial complaint
   in a securities action, absent a finding of subjective bad faith, was unsupported by Rule 11, the court's
23 inherent powers, and federal statute.  That case is not applicable to this situation.  Here, AMS seeks
   sanctions for an amended complaint filed as a matter of right, not an original complaint.  However, as
24 there, no subjective bad faith exists here.

25
26
27
28

Case No. C 07-4820 (MMC)
Plaintiff's Mem. P's and A's in Opp'n to Second Motion to Dismiss

## CERTIFICATE OF SERVICE

The foregoing document and supporting papers have been filed with the Court this day though the Court's Electronic Case Filing system, which will provide electronic notice and service upon the parties listed below:

Kevin C. McCann
Paul, Hastings, Janofsky & Walker LLP
55 Second Street
Twenty-Fourth Floor
San Francisco, CA 94105
Telephone: (415) 856-7000
Facsimile: (415) 856-7100
E-mail: kevinmccann@paulhastings.com

Robert M. Masters
Timothy P. Cremen
Bhaskar Kakarla
Paul Hastings
875 15th Street, N.W.
Washington, DC 20005
 Tel: (202) 551-1700
Fax: (202) 551-1705
E-mail: robertmasters@paulhastings.com, timothycremen@paulhastings.com, bhaskarkakarla@paulhastings.com

Dated: January 4, 2008

By:      /s/ Jeffrey K. Lee

437686v1

Case No. C 07-4820 (MMC)
Plaintiff's Mem. P's and A's in
Opp'n to Motion to Dismiss