EXHIBIT 1

Court File No.

CV-07-1406-00

**ONTARIO**
**SUPERIOR COURT OF JUSTICE**

B E T W E E N:

HILARY VIEIRA

Plaintiff

- and -

...IGATION SYSTEMS GROUP LTD., PETER VERBEEK and VIRAF KAPADIA

Defendants

**STATEMENT OF CLAIM**

TO THE DEFENDANTS:

A LEGAL PROCEEDING HAS BEEN COMMENCED AGAINST YOU by the Plaintiff. The claim made against you is set out in the following pages.

IF YOU WISH TO DEFEND THIS PROCEEDING, you or an Ontario lawyer acting for you must prepare a Statement of Defence in Form 18A prescribed by the Rules of Civil Procedure, serve it on the Plaintiff's lawyer or, where the Plaintiff does not have a lawyer, serve it on the Plaintiff, and file it, with proof of service, in this court office, WITHIN TWENTY DAYS after this Statement of Claim is served on you, if you are served in Ontario.

If you are served in another province or territory or Canada or in the United States of America, the period for serving and filing your Statement of Defence is forty days. If you are served outside Canada and the United States of America, the period is sixty days.

Instead of serving and filing a Statement of Defence, you may serve and file a Notice of Intent to Defend in Form 18B prescribed by the Rules of Civil Procedure. This will entitle you to ten more days within which to serve and file your Statement of Defence.

IF YOU FAIL TO DEFEND THIS PROCEEDING, JUDGMENT MAY BE GIVEN AGAINST YOU IN YOUR ABSENCE AND WITHOUT FURTHER NOTICE TO YOU. IF YOU WISH TO DEFEND THIS PROCEEDING BUT ARE UNABLE TO PAY LEGAL FEES, LEGAL AID MAY BE AVAILABLE TO YOU BY CONTACTING A LOCAL LEGAL AID OFFICE.

IF YOU PAY THE PLAINTIFF'S CLAIM, and $500.00 for costs, within the time for serving and filing your Statement of Defence, you may move to have this proceeding dismissed by the court. If you believe the amount claimed for costs is excessive, you may pay the Plaintiff's claim and $400.00 for costs and have the costs assessed by the court.

Date: _May 3, 2007_          Issued by: _____

Address of the court:

7755 Hurontario Street
Brampton, Ontario
L6W 4T6

TO:          STAR NAVIGATION SYSTEMS GROUP LTD.
             300 – 2970 Lakeshore Boulevard West
             Toronto, Ontario
             M8V 1J7

             Tel: (416) 252-2889
             Fax: (416) 252-3963

AND TO:      PETER VERBEEK
             c/o Verbeek & Verbeek
             Barristers & Solicitors
             12 – 1020 Matheson Boulevard East
             Mississauga, Ontario
             L4W 4J9

             Tel: (905) 602-6000
             Fax: (905) 602-5000

2

AND TO:    VIRAF KAPADIA
c/o Star Navigation Systems Group Ltd.
300 – 2970 Lakeshore Boulevard West
Toronto, Ontario
M8V 1J7

Tel:  (416) 252-2889
Fax: (416) 252-3963

## CLAIM

1.    The Plaintiff claims against the Defendant, Star Navigations Systems Inc. ("Star"):

    (a)    damages in the amount of $720,000 in unpaid wages;

    (b)    damages in the amount of $1,200,000 for breach of contract;

    (c)    punitive and/or aggravated damages in the sum of $250,000 as a result of the egregious and highhanded conduct in its treatment of the Plaintiff;

    (d)    an extension of the severance period called for in the parties' employment contract, as a result of the egregious and highhanded conduct in its treatment of the Plaintiff;

    (e)    a declaration that paragraphs 8 and 9 of the contract of employment entered into between the parties are null and void and of no effect;

    (f)    an order pursuant to section 248(3) of the *Ontario Business Corporations Act*, R.S.O. 1990, c.B.16 (OBCA) restraining Star, or its agents from harassing, molesting or annoying the Plaintiff or his family;

    (g)    an order pursuant to section 248(3)(b) of the OBCA appointing a receiver to manage the affairs of Star;

    (h)    an order pursuant to section 248(3)(f) of the OBCA requiring Star, if necessary, to purchase the shares of Star owned by the Plaintiff;

    (i)    an order pursuant to section 248(3)(h), if necessary, setting aside the Licence Agreement entered into between Viraf Kapadia and the Plaintiff of the first part and Star of the second part on or about April 22, 2002;

4

(j)      an order pursuant to section 248(3)(i) compensating the Plaintiff for lost wages and breach of contract in the amounts of $720,000 and $1,200,000 respectively;

(k)     an order pursuant to sections 248(3)(l) and 207 of the OBCA requiring that the corporation be wound up;

(l)      an order restraining Star or its agents from harassing, molesting or annoying the Plaintiff and his immediate family;

(m)    pre-judgment and post judgment interest pursuant to the *Courts of Justice Act*, R.S.O. 1990, c.C.43;

(n)     costs of this proceeding on a substantial indemnity basis;

(o)     such further and other relief as this Honourable Court may deem just.

2.      The Plaintiff claims against the Defendants, Peter Verbeek ("Verbeek") and Viraf Kapadia ("Kapadia"), personally:

(a)     punitive and/or aggravated damages in the sum of $250,000 as a result of the egregious and highhanded conduct of the said Defendants, in their treatment of the Plaintiff from July, 2006 to the present;

(b)     pre-judgment and post judgment interest pursuant to the *Courts of Justice Act*, R.S.O. 1990, c.C.43;

(c)     costs of this proceeding on a substantial indemnity basis;

(d)     such further and other relief as this Honourable Court may deem just.

5

3.      The Plaintiff, Hilary Vieira ("Vieira") is an individual residing in the City of Mississauga, Ontario.

4.      The Defendant, Star, is a corporation duly incorporated pursuant to the laws of Ontario and carrying on business in the development of early warning systems and instant monitoring systems for aircraft.

5.      The Defendant, Verbeek, is an individual residing in the City of Mississauga, Ontario.

6.      The Defendant, Kapadia, is an individual residing in the City of Mississauga, Ontario.

*Employment with Star*

7.      On or about June 1, 2000, Star hired Vieira, as its President and Chief Technical Officer ("CTO").    He also became a director at that time.    Vieira's hiring took place contemporaneously with the commencement of Star's operations.

8.      Vieira's principal functions were to manage the company, manage the issuance of public shares and supervise the development of the fundamental prototype of the product Star wished to develop and market.

6

9.   Vieira's salary was set initially at $5,500 per month. In addition, he was issued 4,238,000 common shares in Star. Vieira's salary was to increase to a minimum of $168,000 annually once Star became listed on a North American Exchange.

10.  In or about June, 2002, as result of Star becoming a publicly traded company on the Toronto Stock Exchange, the parties entered into an amending agreement.

11.  Approximately 6 months following the commencement of Star's operations, it hired an operations officer who assumed most management responsibilities of Vieira. Following the issue of publicly traded stock, Kapadia, who was at all material times Star's CEO took over marketing, sales, and finance roles. Vieira thereafter was responsible primarily for technical aspects of Star's business.

12.  Vieira continued in his role as President of the corporation without incident until June, 2006. His responsibilities were principally the management of the company's technical development, both software and hardware.

13.  On or about November 1, 2005, the parties entered into a further amending employment contract, which provided, amongst other things that:

     (a)  Vieira could not resign and could not be removed without board approval;

7

(b)    Vieira's compensation was to be $20,000 monthly, along with a bonus of 2,000,000 common shares and further stock options, as well as provision of a motor vehicle;

(c)    In the event of termination, Vieira would be entitled to 5 (five) years salary.

14.    The said contract came into force on January 1, 2006.

### Breach of Employment Contract & Constructive Dismissal

15.    Star has never paid all of Vieira's salary. From June, 2000 to June, 2006, Star paid a portion of Vieira's salary, in part because there were insufficient funds available to pay him, and in part because of requirements of the Toronto Stock Exchange, which requirements were temporary in nature.    Commencing in July, 2006, Star ceased paying Vieira's salary altogether. No reason was cited for the refusal to pay his salary other than the company had insufficient assets.

16.    Star owes Vieira $600,000 in unpaid wages from June, 2000 to June, 2006 and a further $120,000 from July, 2006 to December, 2006.

17.    In August, 2006, Vieira traveled to the Middle East for 2 weeks on business. When he returned, he found that his office had been moved. The new office was unacceptable for several reasons:

8

    (a)    It was located on an unoccupied floor of the building, separate from all of the offices of all other employees of Star;

    (b)    It was neither heated nor air conditioned;

    (c)    It had no telephone or internet access;

    (d)    Vieira's filing cabinets had been moved into an office to which he was given no access.

18.    Through the fall of 2006, the following additional events, amongst others, took place:

    (a)    Vieira's access to Star's computer servers was restricted;

    (b)    Vieira was restricted from contacting potential clients;

    (c)    Staff who had previously reported to Vieira, were advised to report directly to the Chief Operating Officer (an accountant by profession); and

    (d)    On or about December 19, 2006 a memo was sent to all employees announcing the hiring of a new Chief Technical Officer: no notice had been given to Vieira that his position was being replaced.

19.    Through the fall of 2006, Vieira was physically and emotionally intimidated by Verbeek and Kapadia and his ability to continue to do his job effectively was seriously impaired by the actions of Star, Verbeek and Kapadia.

20.   Vieira was asked in September, 2006 by Verbeek to resign, but in a meeting with Kapadia, Verbeek and another director, he was advised that Star would not honour the severance clause contained in his employment contract if he did so.

21.   Star ceased paying for Vieira's motor vehicle as of December, 2006. The said motor vehicle is leased in Vieira's name and he has been forced to make all lease payments since January, 2007.

22.   On or about January 4, 2007, Star purported to dismiss Vieira for cause.

23.   Contrary to the provisions of Vieira's employment contract,

    (a)    No meeting of the board was held to discuss the said dismissal;

    (b)    No board approval was granted in relation thereto; and

    (c)    No notice was given to Vieira of his dismissal.

24.   Star breached the employment contract by constructively dismissing Vieira well before January 4, 2007 by refusing to pay him, making the workplace intolerable, creating conditions which made it impossible for him to perform his functions, and by hiring a replacement for him while he was still in the employ of Star.

10

*Punitive and Aggravated Damages & Personal Liability of Verbeek and Kapadia*

25.   Since January 4, 2007, Star has engaged in a campaign intended to smear Vieira's reputation and prevent him from obtaining employment elsewhere or from pursuing any other business opportunities. Verbeek and Kapadia, personally, and on behalf of Star, have intentionally and with malicious intent engaged in a variety of actions intended to smear Vieira's reputation and prevent him from obtaining employment or from pursuing business opportunities by, amongst other things:

(a)   Writing to prospective business contacts, alleging that Vieira was dismissed for cause and is in breach of a fiduciary and other duties to Star;

(b)   Filing two private informations with the criminal courts, accusing Vieira of theft and fraud;

(c)   Harassing and annoying his family by telephoning his home several times daily and following them as they go about their daily routines;

(d)   Launching three separate frivolous and vexatious civil suits, claiming repayment of debts that were repaid in 2003.

*Ontario Business Corporations Act Remedies*

26.   Vieira and Kapadia are the joint owners of a system and method for transportation vehicle monitoring, feedback and control for which they have been granted a patent. On or about

11

April 22, 2002, Vieira and Kapadia entered into a Licence Agreement with Star, granting Star exclusive rights to the said patent while the Agreement remained in force and effect.

27.  On or about February 6, 2007, Vieira gave notice to Star, pursuant to section 9 of the Agreement that Star was in breach of the terms of the Agreement and unless said breach was remedied within 30 days, the Agreement would be terminated.  Star did not remedy the breach with the result that the Agreement terminated on or about March 6, 2007.

28.  Notwithstanding the termination of the Agreement, Star continues to advise potential licencees of the patent that the Agreement is in full force and effect, that it retains exclusive rights over the patent and that Vieira is in violation of the Agreement, thereby significantly compromising Vieira's abilities to use the patent which he owns or to pursue business opportunities open to him.

29.  During his tenure with Star, Vieira guaranteed both a credit card and a line of credit for Star's benefit.  The credit card was used by Vieira and by Star for business related expenses and had a limit of $5,000.  The credit line was used exclusively by Star.  Star has refused to make payments on the credit card, forcing Vieira to make payments to avoid damage to his personal credit.  The line of credit, while being paid down remains a liability of approximately $25,000.

30. The actions of Star in terminating Vieira and its actions since termination as set out herein are oppressive and unfairly prejudicial to Vieira.

31. Vieira proposes that this action be tried at Brampton.

Date: _____

McCLELLAND LAW
A Professional Corporation
Lawyers
202 Main Street North
Brampton, Ontario
L6V 1P1

Frances M. Wood
Law Society No. 41088F
Tel.    905-793-3026
Fax    905-793-2446

Solicitors for the Plaintiff

13

HILARY VIEIRA

Plaintiff

and

STAR NAVIGATION et al

Defendants CV-07-1406 00

Court File No.

**SUPERIOR COURT OF JUSTICE**

Proceeding commenced at BRAMPTON

**STATEMENT OF CLAIM**

**McCLELLAND LAW**
A Professional Corporation
Lawyers
202 Main Street North
Brampton, Ontario
L6V 1P1

**FRANCES M. WOOD**
LSUC #41088F
Tel: (905) 793-3026
Fax: (905) 793-2446

Solicitors for the Plaintiff

EXHIBIT 2

Court File No. CV-07-1406-00

**ONTARIO**

**SUPERIOR COURT OF JUSTICE**

BETWEEN:

**HILARY VIEIRA**

Plaintiff

and

**STAR NAVIGATION SYSTEMS GROUP LTD., PETER VERBEEK and VIRAF KAPADIA**

Defendants

AND BETWEEN:

**STAR NAVIGATION SYSTEMS GROUP LTD.**

Plaintiff by Counterclaim

and

**HILARY VIEIRA, 1122277 ONTARIO INC., I-TRAX INTERNATIONAL CORP., THOMAS STEVENSON, GLOBAL MANAGEMENT GROUP LTD., AEROMECHANICAL SERVICES LTD. AND JOHN CAMPANA**

Defendants by Counterclaim

## STATEMENT OF DEFENCE AND COUNTERCLAIM OF THE DEFENDANTS, STAR NAVIGATION SYSTEMS GROUP LTD. and VIRAF KAPADIA

*TO THE DEFENDANT(S) TO THE COUNTERCLAIM:*

A LEGAL PROCEEDING has been commenced against you by way of a Counterclaim in an action in this court. The claim made against you is set out in the following pages.

IF YOU WISH TO DEFEND THIS COUNTERCLAIM, you or an Ontario lawyer acting for you must prepare a defence to Counterclaim in Form 27C prescribed by the Rules of Civil Procedure, serve it on the plaintiff by Counterclaim's lawyer or, where the plaintiff by Counterclaim does not have a lawyer, serve it on the plaintiff by Counterclaim, and file it, with

proof of service, in this court, WITHIN TWENTY DAYS after this statement of defence and Counterclaim is served on you.

If you are not already a party to the main action and you are served in another province or territory of Canada or in the United States of America, the period for serving and filing your defence is forty days.  If you are served outside Canada and the United States of America, the period is sixty days.

If you are not already a party to the main action, instead of serving and filing a defence to Counterclaim, you may serve and file a notice of intent to defend in Form 18B prescribed by the Rules of Civil Procedure.  This will entitle you to ten more days within which to serve and file your defence to Counterclaim.

IF YOU FAIL TO DEFEND THIS COUNTERCLAIM, JUDGMENT MAY BE GIVEN AGAINST YOU IN YOUR ABSENCE AND WITHOUT FURTHER NOTICE TO YOU.  IF YOU WISH TO DEFEND THIS PROCEEDING BUT ARE UNABLE TO PAY LEGAL FEES, LEGAL AID MAY BE AVAILABLE TO YOU BY CONTACTING A LOCAL LEGAL AID OFFICE.

Date:  **SEP 0 4 2007**            Issued by: _____

                                                Local Registrar        T. MCLAREN

                          Address of      7755 Hurontario Street
                          Court Office    Brampton, Ontario  L6W 4T6


TO:        **THOMAS STEVENSON**
           907 Gablehurst Cres
           Pickering, Ontario  L1V 5G3


AND TO:    **1122277 ONTARIO INC.**
           3846 Trelwany Circle
           Mississauga, Ontario  L5N 5J5


AND TO:    **I-TRAX INTERNATIONAL CORP.**
           c/o 2283 Argentia Road
           No. #8
           Mississauga, Ontario  L5N 5Z2

AND TO:    **GLOBAL MANAGEMENT GROUP LTD.**
75 The Donway West
Suite #204
Toronto, Ontario  M3C 2L9

AND TO:    **AEROMECHANICAL SERVICES LTD.**
c/o Tingle Merrett LLP
#1250, 639 – 5th Avenue Southwest
Calgary, Alberta  T2P 0M9

AND TO:    **JOHN CAMPANA**
1348 Watersedge Road
Mississauga, Ontario  L5J 1A1

AND TO:    **MCCLELLAND LAW**
A Professional Corporation
202 Main Street North
Brampton, Ontario  L6V 1P1

**Frances M. Wood (LSUC#41088F)**
Tel:      905-793-3026
Fax:     905-793-2446

Solicitors for the Plaintiff

## DEFENCE

1.   The Defendants, Star Navigation Systems Group Ltd. ("**Star**" or the "**Company**") and Viraf Kapadia ("**Kapadia**") (collectively, "**these Defendants**"), deny all of the allegations contained in the statement of claim unless any such allegations are expressly admitted in this statement of defence.

**The Parties**

2.   Star is a corporation incorporated under the laws of the Province of Ontario. Star is a publicly-traded company, traded on the TSX Venture Exchange, under the stock symbol SNA. Star is in the business of developing, selling and distributing instant monitoring systems for various types of vehicles in the transportation industry, including the aviation industry. Star's main product is its real-time in-flight safety monitoring system ("**ISMS**").

3.   Kapadia is an individual who resides in the City of Mississauga, in the Province of Ontario. Kapadia is the Chief Executive Officer and a director of Star. In addition, Kapadia is an owner, jointly with the plaintiff, Hilary Vieira ("**Vieira**"), of certain patents registered in the United Kingdom, Australia, Hong Kong, the United States of America and Canada.

4.   The defendant, Peter Verbeek ("**Verbeek**"), is an individual who resides in the Town of Caledon, in the Province of Ontario. Verbeek was a member of Star's board of directors (the "**Board**") for the period from August 2002 to the Spring 2007.

5.   Vieira was employed by Star from June 1, 2000 to January 4, 2007 at which time his employment was terminated for just cause. At the time of Vieira's termination, he was the President and Technical Director of Star. While Vieira was employed by Star, he was part of the Company's senior management team and was also a director of Star. Vieira reported directly to Kapadia.

6.   The defendant by counterclaim, 1122277 Ontario Inc. ("**Software Forum**"), is a corporation incorporated under the laws of the Province of Ontario with its head office in

-2-

the City of Mississauga. 1122277 Ontario Inc. carried on business under the name Software Forum. Software Forum was incorporated on March 13, 1995. Vieira is, or was, at all relevant times, the President and a director of Software Forum. Software Forum is not, nor has it ever been, a division of or in any way related to Star. Software Forum is, or was, at all relevant times, Vieira's personal company and an alter ego of Vieira.

7.    The defendant by counterclaim, Global Management Group Ltd. (**"Global"**), is a corporation incorporated under the laws of the Province of Ontario with its head office in the City of Toronto. For the period from on or about March 12, 2005 to on or about August 15, 2006, Global provided various services to Star through its principal, the defendant by counterclaim, Thomas Stevenson (**"Stevenson"**). Global is an alter ego of Stevenson.

8.    Stevenson resides in the Town of Pickering, Ontario and is a director of Global. For the period from on or about March 12, 2005 to on or about August 15, 2006, Stevenson provided various consulting services to Star.

9.    The defendant by counterclaim, I-Trax International Corp. (**"I-Trax"**), is a corporation incorporated under the laws of the State of Delaware, in the United States of America. The name "I-Trax International" is registered as a sole proprietorship in Ontario by Stevenson, which carries on business in sales and distribution. I-Trax is in the business of distributing flight tracking products and services. I-Trax was incorporated on January 3, 2006. I-Trax International was registered as a sole proprietorship in Ontario on October 30, 2006. Stevenson is registered as the sole proprietor of I-Trax. I-Trax is not, nor has it ever been, a division of or in any way related to Star.

10.    The defendant by counterclaim, AeroMechanical Services Ltd. (**"AMS"**), is a publicly-traded company with its registered head office in Calgary, Alberta. AMS is in the business of designing, developing and providing services to the global aerospace industry. AMS is Star's main competitor.

-3-

11.    The defendant by counterclaim, John Campana ("**Campana**"), is an individual who resides in the City of Mississauga, Ontario.    Campana was the Vice-President of Marketing and Sales of Star for the period from January 30, 2006 until he resigned on August 3, 2007.    While Campana was employed by Star, he was a member of the Company's senior management team.    Campana reported directly to Star's Chief Operating Officer.

**Vieira's Contractual Obligations to Star**

12.    Vieira's terms of employment with Star are contained in a written employment agreement dated June 1, 2000 (the "**Vieira Employment Agreement**").

13.    The Vieira Employment Agreement provides, among others, the following terms and conditions:

1.    APPOINTMENT:

The Company hereby retains the services of Hilary as President for the purpose of managing the Company, managing the Public issue, supervising the development of the prototype, both software and hardware, and in general managing the day to day running of the Company.

In recognition, that Hilary is being retained into senior management and that he is a director of Star, Hilary shall not be permitted to resign without proper board approval.

2.    DUTIES AND RESPONSIBILITIES:

*The Company and Hilary agree that the entire management of the Company's technical development both software and hardware come under his purview and are his responsibility.    Hilary recognizes that he Company is a development stage Company and in the near future may rework this agreement to better suit the Company's requirements.*

Responsibilities will also include supervision of management and staff of the various office facilities and will include managing the Company's remote facilities including ground stations and data processing centres.    Hilary will be involved in project planning and liasing with official agencies during the process of testing, and flight test.    *In general his duties encompass all the duties of a president for a normal public Company.*

Hilary acknowledges and agrees that he shall be required to report to the CEO of the Company.    Hilary further acknowledges that he will do his utmost to ensure that any publication prepared by him in the performance of his duties under this agreement will be for the benefit of the Company and in the event of doubt will be approved by the CEO of the Company in his sole discretion prior to publication.

-4-

The Company and Hilary both agree that the patent rights of the device and system being jointly held by Mr. Hilary Vieira and Mr. Viraf Kapadia entitle Hilary to due compensation for the use of the rights and future modifications by the Company and Hilary to the system and/or device will not nullify this agreement.

Since this appointment is of a full time nature, Hilary will make himself available as required for business trips, trade shows, customer demonstrations, meetings, etc for which Hilary will be compensated as per Company's rule and regulations existing at that time.

It is agreed that these tasks shall be, primarily performed by Hilary from the Company's premises in Toronto. If the duties require significant travel abroad, then the responsibility for obtaining "long-term" visas will rest with Star Navigation. Hilary warrants that he is not restricted to travel to any country, except by that country's normal visa restrictions.

[…]

8.    CONFIDENTIALITY

*Hilary acknowledges that he being a director and involved in senior management roles in the Company has had and shall have access to and shall be entrusted with confidential information and trade secrets, which are not in the public domain concerning the business affairs of the Company. Hilary further acknowledges and agrees that the right to keep secret such confidential information and trade secrets with respect to all aspects of the system and related technology, including, but not limited to the methodology, technical aspects and instruments related thereto (to the extent that they are not in the public domain) constitutes a proprietary right which the Company is entitled to protect as may be required by the Company. Accordingly, Hilary covenants and agrees with the Company that:*

> 1.    *That he will not directly or indirectly at any time whether during the term of this Agreement or any time hereafter use of disclose, divulge, furnish, use for the benefit of or make accessible to any other person, firm, corporation, or other entity save and except as the Company may direct, all or any part of the confidential information or trade secrets which are not in the public domain respecting the operations of the Company, including, without limiting the generality of the foregoing, financial statements, lists of accounts, terms of sale, price lists, information respecting any plans, scale, techniques, charts, manuals, reports, processes, or quality control systems or procedures or methods of doing business, developed or being developed, used, sold or any other manner employed by the Company (hereinafter collectively called the "information").*

> 2.    *Hilary further covenants and agrees that he will take all reasonable steps to prevent any of the information being used or disclosed by any other person, corporation, firm or other entity other than as permitted thereunder.*

-5-

3.     *Hilary acknowledges and agrees that the obligations under this section are to remain in effect for five (5) years after the termination of this Agreement or any part thereof. [Emphasis added]*

## 9.     NON-SOLICITATION:

*Hilary agrees that during the term, or any renewal term of this Agreement and for a period of five (5) years thereafter, he will not either alone, in partnership or in conjunction with any individual, firm, corporation, institution or other entity whether as principal, agent, employee, director, manager, shareholder, partner, security holder or in any other capacity whatsoever*

1.     *Attempt to solicit any present or potential customer of the Company away from the Company; and do any deliberate acts which may impair the relations between the Company and any of its clients, employees or others or which may be otherwise detrimental to the business being carried on by the Company.*

2.     *Carry on or be involved in any business related to the areas of endeavour herein.*

3.     *Apply for, or be employed in a job related to the areas of endeavour herein for a period of three years after the termination of this agreement. [Emphasis added]*

## 10.     REMEDIES:

Hilary acknowledges that a breach or threatened breach by him of the provisions of Section 8 and Section 9 will result in the Company and its sharcholders suffering irreparable harm, which cannot be calculated or fully or adequately compensated by recovery of damages alone. Accordingly, Hilary agrees that the Company shall be entitled to interim and permanent injunctive relief, specific performance and other equitable remedies, in addition to addition to any other relief to which the Company may become entitled.

14.     Star and Vieira subsequently entered into negotiations to amend Vieira's Employment Agreement, but new terms were never agreed upon by the parties.

15.     These Defendants deny that any draft amending agreements and/or draft employment agreements are binding on the parties, as alleged in the statement of claim or at all.

**Vieira Agreed that Salary Would Accrue**

16.     Star was bound by the requirements of the TSX in respect of management salaries. More specifically, one of the TSX's conditions of Star going public was that management, including Vieira, could not draw salaries until such time as the Company was generating revenue. Vieira was aware of this term, and agreed to be bound by it.

-6-

17.     Further, all of Star's management team, including Vieira and Kapadia, orally agreed amongst each other, not to draw any salaries from the Company until such time as the Company was earning revenues.

18.     Star and Vieira agreed that in order to comply with the TSX's rules, Vieira's salary would be drawn from time to time, and that salary would accrue.

19.     The TSX's rules are incorporated by reference and constitute an express, or alternatively, an implied term of Vieira's Employment Agreement.

**Vieira was not Constructively Dismissed**

20.     Star did not constructively dismiss Vieira. Star's decision to move Vieira's office was made during a meeting at which Vieira was present. Vieira participated in making, and agreed with, the decision.

21.     Vieira's office was not the only office to be moved in August 2006. Kapadia also moved his office to the same location as Vieira's office. Further, Vieira's new office was heated and air conditioned. The parties agreed that they would use their cellular telephones until a technician from the telecommunications provider was able to attend at Star to install the telephone cables.

**Vieira's Fiduciary Obligations to Star**

22.     As a senior management employee of Star, Vieira owed fiduciary duties to Star. He continues to owe fiduciary duties to Star after the termination of his employment.

23.     Vieira owed Star the duties of loyalty, good faith, honesty and a duty to avoid all conflicts of duty and self-interest. Vieira had an obligation to act honestly, in good faith and with a view to advancing only Star's best interests. Vieira had a duty not to enter into engagements or agreements in which he had a personal interest, directly or indirectly, that conflicted with any of Star's business interests without making full disclosure of same to Star and without obtaining Star's consent. Vieira had a duty not to act in a secret or duplicitous manner to take advantage of opportunities that ought to have been opportunities for Star.

-7-

### Vieira's Duty of Confidence to Star

24.  As a fiduciary employee, Vieira had access to and was entrusted with Star's confidential and commercially sensitive proprietary information. As a result, Vieira owed, and continues to owe Star, a fiduciary duty and a duty of confidence, including the duty not to compete unfairly with Star, and not to solicit corporate opportunities, customers and employees of Star and a duty not to misuse confidential information. Further, Vieira also has a duty not to exercise any unfair advantage he may have by virtue of his former employment with Star.

25.  Vieira breached his fiduciary duties and his duty of confidence, which he owed to Star, both before and after the termination of his employment, the particulars of which are provided herein.

### Star's Business Operation

26.  Star is the exclusive licensee of ISMS, which is the first system in the world to feature in-flight data analysis, monitoring and diagnostics with a real-time connection between the aircraft and the ground. ISMS stores information and transmits it to a ground station where flights can be monitored for safety and maintenance purposes from the ground.

27.  Star's main product is the ISMS. However, beginning in or about 2001 or 2002, in response to customer demand, Star began planning an expansion of its business to include flight tracking products and services. During the years 2005 and 2006, Star was in the process of expanding its market by adding a flight tracking feature to its ISMS system. Vieira was primarily responsible for such expansion.

28.  The ISMS system runs on satellite technology supplied by Iridium Satellite LLC ("**Iridium**"). Iridium is a provider of various satellite solutions with complete coverage of the Earth. Iridium only sells its technology through registered agents, which are referred to in the industry as value-added resellers ("**V.A.R.s**").

29.  Blue Sky Network ("**BSN**") is the V.A.R. through which Star obtains access to the Iridium network.

-8-

30.  Star has ISMS systems installed in aircrafts in India.  However, these systems are not and cannot be activated because Star does not have an Aeromobile License, which is required by the Indian government to activate the system.  Thus, one of Star's primary mandates has been, and continues to be, to obtain an Aeromobile License in order to activate its systems in India.

**Vieira's Employment Responsibilities**

31.  As a Star employee, Vieira's mandate included, among other things, the following:

(a)  Expanding Star's business to introduce flight tracking products and services;

(b)  Obtaining exclusivity rights for Star to become a V.A.R. for Iridium in India; and

(c)  Obtaining the Aeromobile License for Star in India.  To assist Vieira in this mandate, Star retained the services of Cain Technologies (I) PVT. Ltd. (**"Cain"**) to act as Star's agent, and to work with Vieira, in India, to secure the Aeromobile License.  Cain is a technology-oriented organization that provides support services to principals who conduct business in India.

**Star Terminated Vieira's Employment for Just Cause**

32.  Vieira breached his contractual and fiduciary duties owed to Star during the course of his employment and thereafter.  More specifically, while he was employed by Star, and without Star's knowledge or consent at the time, Vieira secretly engaged in a number of activities that constituted a breach of his contractual and fiduciary duties.

33.  On January 4, 2007, Star terminated Vieira's employment for just cause, the particulars of which are provided in the following paragraphs of this pleading.  In addition to the facts that constituted just cause that existed at the time of termination, Star acquired further knowledge about Vieira's activities while he was employed by Star and acquired further cause for the termination of his employment after the termination itself.

-9-

**Vieira Breached his Contractual and Fiduciary Duties**

34.  Both prior to and after the termination of Vieira's employment, Vieira was engaged in conduct that breached the contractual and fiduciary duties that he owed to Star. Vieira:

   (a)  Intentionally exceeded his authority as a management employee to procure a personal benefit;

   (b)  Stole Star's confidential corporate opportunities;

   (c)  Misused Star's confidential and propriety information; and

   (d)  Intentionally caused damage to Star's business interests.

35.  In addition to the above, Vieira is now employed by or engaged in providing his services to Star's primary competitor, AMS, and in the course of doing so, has wrongfully transferred business opportunities belonging to Star to AMS without Star's authority or consent.

36.  Vieira is also employed by or engaged in providing services to I-Trax, which he, Stevenson and others incorporated to directly compete against Star in the flight tracking products and services market.

37.  Vieira has been providing services and Star's confidential information to AMS and I-Trax since at least March 2007 and at least June 2006 to present, respectively.

**Vieira Intentionally Exceeded his Authority to Procure a Personal Benefit**

*The Lease Issue*

38.  On December 19, 2005, Vieira executed a Lease for his personal vehicle, a 2002 BMW 745i, with Landmark Vehicle Leasing. Without Star's knowledge or consent, Vieira executed the Lease on behalf of Star and on his own behalf (the "**Lease**") instead of on his own behalf only.

39.  On December 19, 2005, without Star's knowledge or consent, Vieira executed a guarantee on the Lease on behalf of Star in order to obtain financing for his vehicle in addition to

-10-

executing an authorization to allow the leasing company to deduct the Lease payments directly from Star's bank account.

40.    At no time did Vieira have Star's authority or consent to execute the guarantee on behalf of Star, nor did he have Star's authority or consent to authorize the automatic deductions from Star's bank account for the Lease payments. At no time did Vieira request such authority or consent from the CEO, or Star's Board.

41.    In or about March 2006, it came to Kapadia's attention that Vieira had executed the Lease and guarantee in Star's name and on behalf of Star. Kapadia immediately instructed Vieira to remove Star's name from the Lease and guarantee. Vieira agreed to do so. However, Vieira subsequently wrongfully failed or refused to cause Star's name to be removed from the Lease despite repeated demands by Kapadia and others and despite Vieira's numerous undertakings to do so.

42.    Vieira only removed Star's name from the Lease after the termination of his employment.

**Stealing of Star's Confidential Corporate Opportunities**

43.    During the period from mid - 2002 to August 2006, Vieira travelled back and forth between North America and India, at Star's expense, with the primary mandate of securing the Aeromobile License for Star in India. However, instead of working on Star's behalf while he was in India, Vieira secretly negotiated contracts on and for his own behalf and/or on and for the behalf of Software Forum and/or on and for the behalf of I-Trax and/or on and for the behalf of Stevenson.

***The Iridium Opportunity***

44.    Iridium is Star's primary supplier of satellite communications.

45.    Star's ISMS system runs on Iridium's technology and Star is dependent on Iridium in that regard.

46.    Star is not, nor has it ever been, a V.A.R. for the distribution of Iridium's technology, primarily because Star does not have enough installations, at this time, to qualify.

-11-

However, Star has worked and continues to work towards becoming a V.A.R. for the distribution of Iridium's technology throughout the world and to become an exclusive V.A.R. in India.

47.  Star's primary contact at Iridium was Ted O'Brien, the Vice-President of Iridium.  While Vieira was employed by Star, he was Star's primary contact with respect to any business related to Iridium.

48.  As early as June 8, 2006, Vieira secretly, in conjunction with Software Forum and/or I-Trax and/or Stevenson, as the case may be, attempted to and/or planned on obtaining exclusivity rights to Iridium for the benefit of himself and/or Software Forum and/or I-Trax and/or Stevenson, as the case may be, to the corresponding detriment of Star.

49.  Vieira breached his fiduciary duties to Star by:

(a)  Secretly attempting to secure opportunities for his own benefit and/or for the benefit of Software Forum and/or Stevenson and/or I-Trax at the expense of Star; and by

(b)  Secretly negotiating with and/or attempting to enter into negotiations with and/or agreements with Iridium in which he had a personal interest that conflicted with Star's business interests.

50.  Vieira did not disclose any of these business interests to Star nor did he obtain Star's consent to enter into such business.  Vieira acted in a secret and duplicitous manner to take advantage of opportunities that he ought to have procured for Star.

51.  Vieira wrongfully used confidential and proprietary information belonging to Star for his benefit and/or for the benefit of Software Forum and/or I-Trax and/or Stevenson without Star's knowledge or consent.

*The BSN Opportunity*

52.  BSN supplies Star with the transponder and antenna that allow Star to access and use the Iridium network.

-12-

53. Star's primary contact at BSN was Jon Gilbert, the President of BSN. While Vieira was employed by Star, he was Star's primary contact for BSN. By virtue of Vieira's employment with Star, he developed and fostered a close relationship with Jon Gilbert.

54. In or about November 2006, Star learned that Vieira had wrongfully exploited such relationship and had been secretly negotiating directly with BSN for purposes other than the business of Star. More specifically, on June 30, 2006, Vieira, through his personal company, Software Forum, entered into a Memorandum of Understanding ("**MOU**") with BSN for the purpose of Software Forum becoming BSN's exclusive sales agent for the Middle East and the Indian sub-continent. This business opportunity ought to have been a business opportunity for Star, and securing such opportunity for Star was part of Vieira's mandate. Vieira stole the opportunity from Star for his own benefit and/or for the benefit of Software Forum and/or I-Trax and/or Stevenson.

55. On October 30, 2006, Vieira sent an e-mail to Mr. Gilbert requesting that Mr. Gilbert communicate with Vieira on the MOU and all non-Star related topics at his personal e-mail address at HilaryVieira@rogers.com.

56. Vieira breached his fiduciary duty by secretly negotiating with and/or entering into and/or attempting to enter into engagements and/or agreements with BSN in which he had a personal interest that conflicted with Star's business interests. At no time did Vieira make any disclosure whatsoever of these business interests to Star nor did he obtain Star's consent to enter into such business ventures. Vieira acted in a secret and duplicitous manner to take advantage of opportunities that he ought to have procured for Star.

57. Further, Vieira wrongfully used confidential and proprietary information belonging to Star for his benefit and/or for the benefit of Software Forum and/or I-Trax and/or Stevenson without Star's knowledge or consent.

*The ONGC Opportunity*

58. During the period from July 2005 to August 2006, Vieira travelled to India regularly, at Star's expense, for the purported purpose of securing the Aeromobile License for Star. However, in January 2007, it came to Star's attention that, during these travels, and

-13-

unbeknownst to Star, Vieira had been secretly negotiating contracts, in conjunction with Cain, to acquire contracts with the Oil and Natural Gas Commission of India ("ONGC") and Indian Railways on his own behalf and/or on behalf of Software Forum and/or I-Trax and/or Stevenson, for the installation of flight tracker systems in ONGC helicopters and Indian Railways trains.

59.    This opportunity ought to have been a Star opportunity and ought to have been procured by Star and Vieira. At no time did Vieira advise Star of the opportunity. Rather, Vieira secretly entered into these negotiations for his own benefit and/or for the benefit of I-Trax and/or Stevenson.

60.    While Vieira was secretly negotiating deals with Cain, he held out, falsely, to Cain's representatives that he was negotiating on behalf of Star and that I-Trax was a division of Star.

61.    On January 11, 2007, Kapadia attended a meeting in Delhi, India to meet with Cain regarding progress on obtaining the Aeromobile License.

62.    At the meeting, Kapadia learned that:

(a)    Cain had been negotiating a contract with I-Trax;

(b)    Vieira was the contact person for I-Trax;

(c)    The negotiations for the contract took place between Vieira, on behalf of I-Trax, and Cain;

(d)    Cain was scheduled to sign the contract with I-Trax January 12, 2007; and

(e)    Vieira had falsely represented to Cain that I-Trax was a division of Star. Cain mistakenly believed that they had been negotiating with Star all along when, in fact, it had been negotiating with I-Trax and Vieira.

63.    It was at this meeting that it became apparent to Star that while Vieira had been travelling to and from India, at Star's expense and for Star's business, he had been secretly

-14-

negotiating contracts on his own behalf and/or on behalf of Software Forum and/or I-Trax and/or Stevenson for the benefit of himself and/or Software Forum and/or I-Trax and/or Stevenson.

64.  When Kapadia learned this information, he advised Cain that Vieira was no longer employed by Star and that I-Trax was not a division of Star. Upon learning this information, Cain advised Kapadia that:

    (a)    Cain had never intended to deal with I-Trax; and

    (b)    Cain had intended to deal only with Star.

65.  Vieira breached his fiduciary duties to Star by secretly negotiating with and/or entering into and/or attempting to enter into agreements with Cain in which he had a personal or business interest that conflicted with Star's business interest. At no time did Vieira make any disclosure whatsoever of his business opportunities to Star nor did he obtain Star's consent to enter into such negotiations on his own behalf or on the behalf of Software Forum and/or I-Trax and/or Stevenson. Vieira acted in a secret and duplicitous manner to take advantage of opportunities that ought to have been opportunities for Star.

66.  Further, with respect to the Cain negotiations, Vieira falsely held himself out as being a representative of Star and falsely held out that I-Trax was a division of Star. Vieira intentionally misrepresented his relationship with I-Trax for the purpose of taking for himself opportunities that ought to have been opportunities for Star. Further, in his negotiations with Cain, Vieira unlawfully used confidential and proprietary information belonging to Star for his benefit and/or for the benefit of Software Forum and/or I-Trax and/or Stevenson.

## The Indian Air Force Opportunity

67.  In November 2005, in his capacity as President and Technical Director of Star, Vieira met with Commander Rahul Monga in New Delhi. Commander Monga was introduced to Star by Jon Gilbert of BSN for a business opportunity for Star and BSN with the

-15-

Indian Air Force ("**IAF**").   Commander Monga was planning a "round the world" expedition on a glider that was scheduled to depart in April 2006 (the **"Expedition"**).

68.   Vieira negotiated and secured an agreement between the IAF and Star whereby Star would equip the glider with a tracking system .  For the purpose of the Expedition, the tracking system was going to be installed on the glider and referred to as the "StarBox". IAF intended to use the StarBox for the purpose of monitoring Commander Monga's progress during the Expedition.

69.   Star and the IAF agreed that Star was to sponsor the Expedition, which would have been a very lucrative marketing opportunity for Star.  More specifically, Star was to have exclusive global advertising rights and was to be permitted to place vinyl stickers with Star's name and logo on the glider.  All of these terms were negotiated by Vieira, on behalf of Star.

70.   In or about March 2006, Star learned that the Expedition would take place in 2007 instead of 2006.

71.   In or about June or July 2007, after the termination of Vieira's employment, it came to Star's attention that AMS, in conjunction with I-Trax and Vieira, were now sponsoring the Expedition instead of Star.

72.   Vieira had been the primary, if not sole, contact on the IAF project.  Vieira is now employed by and/or providing services to AMS and I-Trax as Chief Technical Officer. Vieira breached his fiduciary duties owed to Star by wrongfully using its confidential information and by unlawfully and secretly transferring business opportunities to AMS and I-Trax.  Vieira acted in a secret and duplicitous manner to take advantage of an opportunity that was Star's opportunity in order to benefit AMS and I-Trax.

73.   The Expedition left India on June 1, 2007.  AMS and I-Trax are sponsors of the Expedition and IAF's website indicates that the "communication support team" with respect to the Expedition is "I-Trax International Ltd., and Mr. Hilary Vieira."  The I-Trax symbol appears on various pages of the IAF website.  I-Trax's system is described,

-16-

in printed news releases, as a "satellite tracking system mounted onboard the aircraft" in connection with the Expedition. The press releases reference the use of "breakthrough tracking and communications technology provided by Calgary-based Flyht, a wholly owned subsidiary of publicly traded AMS "as proving to be 'critical'" to the Expedition. The Expedition is receiving extensive media coverage. All of these opportunities ought to have been Star's opportunities.

### *Vieria is Employed by a Competitor*

74.   AMS and I-Trax are competitors of Star.

75.   Vieira is currently employed by or is providing services to AMS and I-Trax, in breach of his contractual and fiduciary obligations to Star.

76.   Vieira is bound by the terms of the Vieira Employment Agreement, and in particular, the restrictive covenants contained therein. The Vieira Employment Agreement provided that Vieira could not compete with Star for a period of five (5) years following the termination of his employment. Vieira breached the terms of the Vieira Employment Agreement by competing with Star both before and after the termination of his employment.

77.   The conduct of Vieira, as described above, constitutes a breach of contract, breach of his fiduciary obligations and just cause for the termination of his employment.

### The Termination of Vieira's Employment and Subsequent Events

78.   On January 4, 2007, Star terminated Vieira's employment for just cause. On that date, Verbeek attended at Vieira's home and hand-delivered a termination letter to Vieira and, at the same time, requested that Vieira return to Verbeek certain Star property, including a Toshiba laptop, the keys to Star's offices, and most importantly, the software codes, software programs and the weekly back-up disks that belong to Star (the "**Star Property**"). Vieira refused to return the Star Property to Verbeek and advised Verbeek that he would deliver the Star Property to Verbeek's office later that day.

79.   Vieira has never returned the Star Property to Star.

-17-

**The Licensing Issue**

80.  With respect to paragraph 26 of the statement of claim, Vieira and Kapadia have been granted patents in the United Kingdom, Australia, Hong Kong, the United States of America and Canada.

81.  On or about April 22, 2002, Vieira and Kapadia entered into a licence agreement with Star (the "**Licence Agreement**") granting Star exclusive rights with respect to certain patents until the earlier of the expiry of the last of the patents or the termination of the Licence Agreement.

82.  Contrary to the allegations made in paragraph 27 of the statement of claim, Star has not breached the Licence Agreement. At no time was Vieira entitled to unilaterally exercise the right of termination under paragraph 9.2 of the Licence Agreement. Further, at no time did the licensors terminate the Licence Agreement.

83.  The Licence Agreement continues to be in full force and effect.

84.  The Licence Agreement is Star's main asset.

**Oppression Claims**

85.  The facts pleaded with respect to the oppression remedy claim do not support a cause of action. In any event, Star denies the allegations contained in paragraphs 26 through 30 of the statement of claim.

**Punitive and Aggravated Damages and Personal Liability of Kapadia**

86.  Kapadia denies that he acted in a manner that could attract punitive and/or aggravated damages and/or personal liability.

87.  Vieira has not acted in a reasonable manner to mitigate his alleged damages.

88.  Vieira's claims are excessive and too remote.

89.  These Defendants ask that this action be dismissed against them with costs.

-18-

## COUNTERCLAIM AGAINST HILARY VIEIRA, 1122277 ONTARIO INC., I-TRAX INTERNATIONAL CORP, THOMAS STEVENSON and GLOBAL MANAGEMENT GROUP LTD, AEROMECHANICAL SERVICES LTD. AND JOHN CAMPANA

90.     The plaintiff by counterclaim, Star, claims against Vieira the following:

    (a)     Damages in an amount to be determined at the trial of the action for breach of contract;

    (b)     Damages in an amount to be determined at the trial of the action for breach of fiduciary duty;

    (c)     Punitive and/or exemplary damages in the amount of $50,000;

    (d)     A permanent injunction and mandatory order:

        (i)     Restraining Vieira, until January 4, 2010, from indirectly or directly owning, managing, operating, controlling, being employed by, participating in, or being connected in any manner with the ownership, management, operation or control of AMS, I-Trax and/or any other firm, corporation, partnership, institution, individual or entity that competes with Star, in breach of the Vieira Employment Agreement;

        (ii)     Restraining Vieira, until January 4, 2012, from directly or indirectly soliciting and/or attempting to solicit the trade or patronage of any of Star's customers in breach of the Vieira Employment Agreement and/or in breach of Vieira's fiduciary obligations;

        (iii)     Restraining Vieira from disclosing any confidential information and/or trade secrets belonging to Star to any person, firm or corporation, and from using, directly or indirectly, any such confidential information and/or trade secrets for his own purposes or purposes other than the business of Star in breach of the Vieira Employment Agreement and/or in breach of Vieira's fiduciary obligations; and

-19-

(iv) Restraining Vieira from breaching his ongoing fiduciary obligations owed to Star.

(e) An order requiring Vieira to return the Star Property to Star.

91. Star claims against Software Forum for the following:

(a) Damages in an amount to be determined at the trial of the action for inducing breach of contract and interfering with economic relationships;

92. Star claims against I-Trax for the following:

(a) Damages in an amount to be determined at the trial of the action for inducing breach of contract and interfering with Star's economic relationships;

(b) A permanent injunction and mandatory order:

(i) Restraining I-Trax from assisting or permitting Vieira to engage in breaching the Vieira Employment Agreement and his fiduciary duties;

(ii) Restraining I-Trax from assisting or permitting Stevenson to engage in breaching the Stevenson Agreement and his fiduciary duties;

93. Star claims against Stevenson for the following:

(a) Damages in an amount to be determined at the trial of the action for breach of contract;

(b) Damages in an amount to be determined at the trial of the action for breach of fiduciary duty;

(c) Damages in an amount to be determined at the trial of the action for inducing breach of contract and interfering with Star's economic relationships; and

(d) A permanent injunction and mandatory order:

-20-

(i)    Restraining Stevenson from assisting or permitting Vieira to engage in breaching the Vieira Employment Agreement and his fiduciary duties; and

(ii)    Restraining Stevenson, until March 9, 2015, from indirectly or directly owning, managing, operating, controlling, being employed by, participating in, providing services to, or being connected in any manner with the ownership, management, operation or control of any firm, corporation, partnership, institution, individual or entity that competes with Star;

94.    Star claims against Global for the following:

(a)    Damages in an amount to be determined at the trial of the action for breach of contract; and

(b)    A permanent injunction and mandatory order:

(i)    Restraining Global from assisting or permitting Stevenson to engage in breaching the Stevenson Agreement and his fiduciary duties; and

(ii)    Restraining Global, until March 9, 2015, from indirectly or directly owning, managing, operating, controlling, being employed by, participating in, providing services to, or being connected in any manner with the ownership, management, operation or control of any firm, corporation, partnership, institution, individual or entity that competes with Star.

95.    Star claims against AMS for the following:

(a)    Damages in an amount to be determined at the trial of the action for inducing a breach of contract and interfering with Star's economic relationships; and

(b)    A permanent injunction and mandatory order:

-21-

       (i)     Restraining AMS from assisting or permitting Vieira to engage in breaching the Vieira Employment Agreement and his fiduciary duties;

96.    Star claims against Campana for the following:

      (a)    Damages in an amount to be determined at the trial of the action for breach of contract;

      (b)    Damages in an amount to be determined at the trial of the action for breach of fiduciary duty;

      (c)    Punitive and/or exemplary damages in the amount of $50,000;

      (d)    A permanent injunction and mandatory order:

          (i)     Restraining Campana, for a period of twelve (12) months, from directly or indirectly soliciting and/or attempting to solicit the trade or patronage of any of Star's customers in a breach of his fiduciary obligations;

          (ii)    Restraining Campana from disclosing any confidential information and/or trade secrets belonging to Star to any person, firm or corporation, and from using, directly or indirectly, any such confidential information and/or trade secrets for his own purposes or purposes other than the business of Star in breach of his fiduciary obligations; and

          (iii)   Restraining Campana from breaching his ongoing fiduciary obligations owed to Star.

97.    Star claims against all of the defendants by counterclaim for the following:

      (a)    An accounting of and disgorgement of any and all profits earned by the defendants by counterclaim as a result of their wrongful conduct as set out herein;

      (b)    A permanent injunction and mandatory order restraining the defendants by counterclaim from disclosing any confidential information and/or trade secrets belonging to Star to any person, firm or corporation, and from using, directly or

-22-

indirectly, any such confidential information and/or trade secrets for purposes other than the purpose of Star;

(c)    An order requiring the defendants by counterclaim to return to Star all confidential information and/or information about trade secrets belonging to Star;

(d)    Pre-judgment and post-judgment interest in accordance with the *Courts of Justice Act*, as amended;

(e)    Costs of this action on a substantial indemnity basis; and

(f)    Such further and other relief as this Honourable Court may deem just.

98.    Star repeats and relies on all of the allegations contained in the statement of defence and counterclaim in addition to the allegations set out herein.

**Stevenson and Global's Contractual Obligations to Star**

99.    On March 9, 2005, Star entered into a Non-Competition/Non-Disclosure Agreement with Global (the **"Stevenson Agreement"**).

100.    Stevenson executed the Stevenson Agreement on behalf of Global.

101.    Stevenson was the only employee of Global who provided services to Star under the Stevenson Agreement. Star pleads that Stevenson is bound by the terms contained in the Stevenson Agreement given that he is or was, at all materials times, Global's only personal representative. Global is Stevenson's alter ego.

102.    The Stevenson Agreement contained, *inter alia*, the following covenants:

> For a period of ten (10) years following the date of this Agreement, Global shall not, for the benefit of Global or any person or entity offering, developing or licensing or performing a similar product or service, solicit the business of any [SIC] the Company customer for the purpose of offering, developing or licensing a similar a product or service or perform any service for the benefit of a competitor of the Company without obtaining the prior written consent of the Company. For purposes of this Agreement, competitor of the Company shall be any corporation involved in the transportation industry, including any purchasers of/or successor to the business of such corporations.

-23-

Shall not solicit the employment of any employee of the Company, for a period of ten (10) years following the date of this Agreement by either party for whatever reason without obtaining the prior written consent of the Company. No provisions within this Section shall limit any right, which the Company may have under any statute or common law.

## Stevenson's Duty of Loyalty and Good Faith

103.    Star employed Stevenson as a consultant to perform various services for Star, including, but not limited to, the following:

   (a)    Advising Star on investor-relations matters;

   (b)    Advising Star on financial and marketing strategies and issues;

   (c)    Assisting Star in promoting the Company and attracting investors;

   (d)    Contacting representatives in the Middle East, Russia and Europe to expand Star's customer base and business contacts in these markets;

   (e)    Performing due diligence on behalf of Star;

   (f)    Raising capital;

   (g)    Promoting the Company;

   (h)    Negotiating financial terms for Star;

   (i)    Working with legal counsel on legal matters; and

   (j)    Generating sales initiatives and marketing for Star.

104.    In addition to Stevenson's contractual obligations, as set out above, Stevenson owed Star fiduciary duties of loyalty and good faith and a duty not to disclose or misuse confidential and proprietary information.

## Stevenson Access to Star's Confidential and Proprietary Information

105.    Stevenson provided consulting services to Star during the period from on or about March 9, 2005 to on or about August 15, 2006.  During that time, Stevenson had access to

-24-

confidential and proprietary information belonging to Star. As such, he owed, and continues to owe, a fiduciary duty, a duty of loyalty, a duty of good faith and a duty of confidence to Star, including the duty not to compete unfairly with Star, and not to solicit corporate opportunities, customers and employees of Star.

106.    Further, Stevenson also had a duty not to exercise any unfair advantage he may have by virtue of his business relationship with Star.

107.    In that capacity, Stevenson had access to confidential and proprietary information belonging to Star relating to Star's customers, products, marketing strategies, finances, business strategies and its operational model.

**Stevenson and Global Breached their Contractual Obligations and Duty of Loyalty and Good Faith**

108.    I-Trax is in the business of selling flight tracking products and services.

109.    Beginning in or about January or February, 2006, Stevenson and/or Global, in conjunction with Vieira and/or I-Trax breached the terms of the Stevenson Agreement.

110.    The defendants by counterclaim have, individually and/or collectively, breached their respective obligations not to misuse or disclose Star's confidential and proprietary information.

111.    Stevenson and/or Global secretly contacted and attempted to conduct business with companies and individuals to whom Stevenson was introduced while he was engaged in activities on behalf of Star for the benefit of I-Trax. The negotiations entered into between Vieira, on behalf of I-Trax, and Cain are only one example of such conduct.

112.    Stevenson and/or Global also secretly contacted several Star employees in an effort to induce them and/or encourage them to leave the employ of Star to join his business ventures.

-25-

113.  Stevenson and/or Global misused confidential and proprietary information Stevenson obtained while he was contractually bound to Star for his own personal purposes or for business purposes other than those of Star.

114.  The conduct of Vieira, Stevenson and Global, as pleaded above, represents a breach of those Defendants' ongoing obligations to Star.

**I-Trax**

115.  I-Trax is a direct competitor of Star in the flight tracking product and services market.

116.  Since early 2006, I-Trax has attempted to secure contracts and/or enter into business relationships with Star's customers and suppliers.

117.  I-Trax has wrongfully copied Star's promotional materials with the purpose of furthering I-Trax's business interests.  Vieira and Stevenson, individually or collectively, have copied Star's promotional materials for the benefit of I-Trax.

118.  Stevenson and Vieira, either individually or collectively on behalf of or for the benefit of I-Trax, provided I-Trax with Star's proprietary and confidential information which I-Trax has unlawfully used to promote and further its business interests.  The IAF Expedition contract is only one example of such behaviour.

119.  Beginning in or about June 2006, while Vieira was still employed by Star, and while Stevenson was still providing his services to Star, both defendants by counterclaim either individually or collectively, began working for and/or providing services to and/or carrying on business with or as I-Trax.

120.  Neither Vieira nor Stevenson disclosed the existence of I-Trax or their involvement with I-Trax to anyone at Star.  In fact, Vieira and Stevenson acted in a secret and duplicitous manner with respect to their involvement with I-Trax, which carried on business in direct competition with Star and attempted to take for their own benefit a market that Star was expanding into for its own business purposes and financial gain.

-26-

*Campana's Fiduciary Obligations to Star*

121.  Campana was a senior management employee at Star and owed fiduciary duties to Star. Campana continues to owe fiduciary duties to Star after the resignation of his employment.

122.  As a fiduciary employee, Campana owed Star duties of loyalty, good faith, honesty and the duty to avoid all conflicts of duty and self-interest. Campana had an obligation to act honestly, in good faith and with a view to advancing only Star's best interests. Further, Campana had a duty not to enter into engagements or agreements in which he had a personal interest, directly or indirectly, that conflicted with any of Star's business interests without making full disclosure to Star and without obtaining Star's consent. In addition, Campana had a duty not to act in a secret or duplicitous manner to take advantage of opportunities that ought to have been opportunities for Star.

123.  As a fiduciary employee, Campana had access to and was entrusted with Star's confidential and proprietary information. As such, Campana owed, and continues to owe, fiduciary duties and a duty of confidence to Star, including the duty not to compete unfairly with Star and not to solicit corporate opportunities, customers and employees of Star. Campana also had a duty not to exercise any unfair advantage he may have had by virtue of his former employment with Star.

124.  Campana breached such fiduciary duties, which were owing to Star, both before and after the resignation of his employment.

125.  While Campana was employed by Star, he met with and/or provided his services to and/or transferred confidential and proprietary information to I-Trax and/or representatives of I-Trax.

126.  Star became aware of such breaches of Campana's duties in or about July 2007 and confronted Campana. Campana denied any involvement with I-Trax and the principals of I-Trax.

-27-

127. However, on or about August 3, 2007, representatives of Star observed that Campana was attending at the offices of I-Trax. Campana discovered that Star's representatives had seen him and a short time later, left a voicemail message at Star's offices in which he tendered his resignation.

128. Further, after his resignation, Campana refused to return his Company laptop to Star, which contains all the customer progress reports and contact information and sub-files.

129. Campana breached his fiduciary duties by pursuing business ventures with I-Trax while he was still employed by Star without first obtaining Star's consent to do so. At no time did Campana make any disclosure whatsoever of these business interests nor did he obtain Star's consent to enter into such business relationships. Not only did Campana intentionally omit to make disclosure of the business interests, but he lied to Star when he was confronted with the issue. Campana acted in a secret and duplicitous manner. Further, Campana wrongfully used confidential and proprietary information belonging to Star for his benefit and/or for the benefit of I-Trax.

*AMS*

130. Vieira has stolen proprietary and confidential information from Star and Star's business opportunities to promote and/or further his personal interests and/or the business interests of AMS. The IAF Expedition contract is only one example of such behaviour.

131. Beginning on or about March 7, 2007, Vieira began working for and/or providing services to and/or carrying on business with AMS in direct violation of the Vieira Employment Agreement and in breach of his fiduciary obligations, which are still owing to Star.

132. AMS and the other corporate defendants by counterclaim and Stevenson, acting individually or in concert, knowingly assisted and permitted Vieira to engage in the unlawful conduct described herein.

133. AMS, Stevenson and the other corporate defendants by counterclaim were aware of the restrictive covenants contained in the Vieira Employment Agreement before Vieira

-28-

commenced employment with and/or commenced providing his services to I-Trax and AMS.

134.    AMS and the other corporate defendants by counterclaim induced Vieira to breach the Vieira Employment Agreement.

135.    By doing so, AMS and the other corporate defendants by counterclaim and Stevenson, either individually or in concert, participated in the breach of the restrictive covenants contained in the Vieira Employment Agreement for their own financial benefit and business purposes, to the corresponding detriment of Star.

**Star has Suffered and Will Continue to Suffer Damages**

136.    As a result of the defendants by counterclaim's unlawful conduct, Star has suffered, and will continue to suffer irreparable harm for which the defendants by counterclaim are liable. Particulars of the harm suffered include loss of future revenue and profit from loss of customers, loss of market share, loss of referral business, loss of goodwill, loss of marketing opportunities and loss of brand awareness. Full particulars of the harm and damages are not yet known, but will be provided prior to the trial of this action.

137.    Star seeks an accounting of all revenues and disgorgement of profits earned by the corporate defendants by counterclaim and Stevenson as a result of the wrongful conduct set out herein.

**Punitive and/or Exemplary Damages**

138.    Vieira, Stevenson and Global reviewed the Vieira Employment Agreement and the Stevenson Agreement, respectively. These parties willingly accepted the restrictive covenants contained in the agreements.

139.    Vieira, Stevenson and Global each knew about and understood the restrictive covenants in their respective agreements. As such, these defendants by counterclaim deliberately and wilfully breached their agreements by engaging in the conduct described herein.

-29-

140.  Further, the corporate defendants and Stevenson knew, or ought to have known, about the ongoing contractual obligations owed by Vieira and/or Stevenson and/or Global, as the case may be, and the ongoing fiduciary obligations owed by Vieira, Stevenson and/or Global to Star.  Notwithstanding this fact, the corporate defendants and/or Stevenson and/or Global deliberately and wilfully induced Vieira and/or Stevenson and/or Global to breach their restrictive covenants, and further, deliberately and wilfully induced those defendants to breach their ongoing fiduciary obligations to Star.

141.  The conduct of the corporate defendants and/or Stevenson and/or Global in breaching duties they owed to Star was deliberate, wilful and premeditated.  Further, the corporate Defendants' conduct and Stevenson's conduct was highhanded, capricious and malicious, and was intended to and in fact did cause harm to Star and its business interests. Therefore, an award of punitive damages against the defendants by counterclaim is warranted in this case.

**Service of AMS Outside of Ontario**

142.  AMS may, without a court order, be served outside Ontario with this counterclaim as the counterclaim consists of claims in respect of a tort committed in Ontario and damages sustained in Ontario arising from such tort and where the claims are properly the subject of this counterclaim.  Star relies upon rule 17.02(g), (h) and (q) of the *Rules of Civil Procedure.*

Date: September 4, 2007

**FOGLER, RUBINOFF LLP**
Barristers and Solicitors
Suite 1200
Toronto-Dominion Centre
95 Wellington Street West
Toronto, Ontario  M5J 2Z9

**Blair Bowen (LSUC# 25256S)**
**Andrea D. McCrae (LSUC# 47207L)**
Tel:    416-864-9700
Fax:    416-941-8852

-30-

Solicitors for the Defendants/Plaintiffs by
Counterclaim, Star Systems Group Ltd. and
Viraf Kapadia

Court File No. CV-07-1406-00

HILARY VIEIRA
Plaintiff

and   STAR NAVIGATION SYSTEMS GROUP LTD. et al.
Defendants

*ONTARIO*
**SUPERIOR COURT OF JUSTICE**

Proceedings commenced at Brampton

**STATEMENT OF DEFENCE AND
COUNTERCLAIM**

**FOGLER, RUBINOFF LLP**
Barristers and Solicitors
Toronto-Dominion Centre
Suite 1200
95 Wellington Street West
Toronto, Ontario
M5J 2Z9

**Blair Bowen (LSUC# 25256S)**
**Andrea McCrae (LSUC# 47207L)**

416-864-9700 (tel)
416-941-8852 (fax)

Solicitors for the Defendants, Star
Navigation Systems Group Ltd. and Viraf
Kapadia